[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13614

_____

D.C. Docket No. 1:15-cr-20436-DPG-8

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS RODRIGUEZ NEREY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 12, 2017)

Before HULL, JORDAN, and BOGGS,[*] Circuit Judges.

HULL, Circuit Judge:

In this direct criminal appeal, defendant Carlos Rodriguez Nerey appeals both his convictions and total sentence related to his role as a patient recruiter and his receipt of kickbacks in a complex health care fraud scheme. Following a five-day trial, a jury found defendant Nerey guilty on the two charges against him in the indictment. After thorough review of the briefs and extensive trial record, and with the benefit of oral argument, we affirm.

## I.    PROCEDURAL HISTORY

On September 29, 2015, defendant Nerey and several other individuals— including Milka Alvarez, Jesus Perez, Joel Alvarez, Sandra Jaramillo, Adolfo Larrea, and Maria Teresa Pupo—were charged in a thirteen-count superseding indictment. All of Nerey's co-defendants eventually pled guilty while he proceeded to trial. Nerey was charged on two counts: (1) conspiracy to defraud the United States under 18 U.S.C. § 371 by paying and receiving health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), (b)(1)(B), and (b)(2)(A) (Count 2) and (2) knowingly soliciting and receiving kickbacks in connection with

---

[*]Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

a federal health care program, in violation of 42 U.S.C. § 1320-7b(b)(1)(A) (Count 9).

On April 1, 2016, a jury found Nerey guilty on both counts.  The district court denied Nerey's motion for judgment of acquittal before the verdict was rendered and denied his renewed motion thereafter.  On May 27, 2016, the district court sentenced Nerey to sixty months' imprisonment on each count to run concurrently, three years of supervised release, and restitution in the amount of $2,366,746.

## II.    TRIAL EVIDENCE

Because defendant Nerey challenges the sufficiency of the evidence supporting his convictions, we outline the trial evidence about the Medicare program, the various home health care agencies engaged in the fraud and kickbacks, and Nerey's involvement.

### A. Medicare

Medicare is a health insurance program overseen by the federal government and is intended for people of age 65 or older or people with a qualifying disability. Medicare is funded through taxpayer contributions and small recipient premiums. Patients who qualify for Medicare benefits have services furnished by a Medicare provider like a doctor, hospital, or home health agency.  Once a service is performed, that provider can bill Medicare and claim payment.  Medicare

3

contractors designated by the respective states will then review claims submitted for payment.  Some claims take two weeks to process, while others may take up to a month.

Claim reviewers look to the following five components for the legitimacy of claims: (1) the patient's entitlement to Medicare; (2) proper enrollment of the provider; (3) the provision of services; (4) compliance with coverage rules; and (5) proper reporting of records.  Because Medicare receives such a high volume of claims, however, rarely do all claims receive a complete and thorough review.  Categorically, Medicare does not pay for claims based on kickbacks or bribes.  See 42 U.S.C. § 1320-7b(b).

**B. Home Health Care**

Under Medicare, "home health care" refers to medical services for patients who require special treatment because they are "homebound."  Homebound patients suffer from a physical or mental limitation that prohibits them from leaving home on a routine basis without the assistance of a wheelchair, walker, or another individual.

Homebound status must be determined and documented by a physician.  For home health care agencies to properly bill Medicare, their patients must have a prescription for home health care.  Patients must meet with a physician and

4

establish a plan of care in order to legitimately receive a prescription.  Thereafter, the treating physician is required to provide progress notes once treatment begins.

All treatment provided in home health care is by skilled professionals— licensed doctors, nurses, and therapists.  With respect to therapy, Medicare covers physical therapy, occupational therapy, and speech language pathology.  Massage therapy is not covered under home health care.  Likewise, therapy notes taken after a session must be recorded by, and come from, a licensed physical therapist.

Relevant to our review is the fact that home health care agencies engage in fraud when they, inter alia, (1) submit claims for a patient who does not qualify for treatment, (2) fail to perform the work billed to Medicare, or (3) pay a kickback to a patient recruiter.  As the name suggests, a patient recruiter procures eligible Medicare beneficiaries and exchanges their information with providers for a kickback on any claims paid by Medicare.

## C. Jesus Perez and Mercy Home Care, Inc.

The fraud perpetrated in this case, including Nerey's involvement, centers on Jesus Perez, one of Nerey's co-defendants.  Perez had a long history with home health care agencies, starting with his work at Wong Home Health Care in 2006 and then La Caridad in 2013 or 2014.  At trial, Perez admitted to engaging in Medicare fraud and paying patient recruiters as far back as his work at La Caridad.

5

Eventually, in late 2014, Perez transitioned to working for Mercy Home Care, Inc. ("Mercy HC"), where he continued these illegal practices. Before he became the owner of Mercy HC, Perez complained to Nerey, one of his previous acquaintances, about the salary Perez was receiving there as an employee. Nerey responded by suggesting that Perez begin inflating invoices.

Perez later became the owner of Mercy HC in October 2014 and enlisted the assistance of close friends and family, including Jesus Garcia and Adolfo Larrea, to help run his operation. At trial, Joel Alvarez described Adolfo Larrea as Perez's "right hand." Several individuals, including Perez's then-wife, Anelys Ayala, were used to cash checks for the payment of illegal kickbacks to recruiters. Another patient recruiter at Mercy HC was Yovani Suarez, who went by the nickname "Tito." As the group would later discover, Suarez was a confidential informant for the Federal Bureau of Investigation ("FBI").

Perez's testimony suggested that he obtained ownership of Mercy HC from its actual owner, Contrado Pineida, through falsified documents. Perez insisted that the transfer was nonetheless done at Pineida's instruction. Under Perez's leadership, Mercy HC submitted fraudulent claims to Medicare and negotiated extensive kickbacks for patient recruiters.

Raciel Leon served as the manager at Mercy HC and kept a book of patient recruiters and payoffs. Leon's logbook was used to keep track of which recruiters

6

held claim to recruiting which patients.  It included patient information along with a column coded by letters to mask kickback recipients.  To keep track of his patients, Nerey would cross-reference this logbook with his own records.  While each recruiter had his or her own letter or letters, entries containing the letter G stood for "gordo," or "fat guy" in Spanish, which was Nerey's nickname.  When paying their recruiters, Perez and Leon utilized inflated invoices, which were later submitted to Medicare, to mask payoffs and made special notations on the memo lines in checks to recruiters—such as "SS" or "special service"—to identify recruiting payments.

**D. Nerey, Sweet Life Staffing, and Nerey Professional Services, Inc.**

Around November 2014, Nerey became associated with Mercy HC.  Nerey was active in Mercy HC's operation by recruiting patients through an established book of patients and purchasing prescriptions, both real and forged, for home health care.  Sandra Jaramillo and Karla Garcia, two other co-defendants, both testified that defendant Nerey carried around a small notebook full of patient names and information.  At Mercy HC, Nerey was Perez's top source of patients, all of whom were eligible Medicare beneficiaries.  Perez paid Nerey between $1,800 and $2,200 per patient recruited.

Nerey used several companies—the two most relevant being Sweet Life Staffing ("Sweet Life") and Nerey Professional Services, Inc. ("NPS")—to funnel

7

kickback money.  Mercy HC would split payments to Nerey between cash to him, which he requested, and checks to Sweet Life and NPS, which eventually became necessary due to the amount of money involved in the conspiracy.

Sweet Life was a therapy-staffing company used by Nerey to process his recruiting kickbacks.  While several witnesses testified that Nerey claimed ownership of Sweet Life, the registered owner was actually Daylin Cabrera.  Nonetheless, Nerey required that all of the patients he recruited be assigned to Sweet Life for "therapy."  Nerey processed kickbacks through Sweet Life using inflated and falsified invoices for fraudulent therapy services.  Invoices were handled in several ways, but often broken into smaller $30 amounts per therapy session to cover up larger kickback amounts.

Nerey was not a licensed physical therapist or nurse, but nearly every fact witness testified that he regularly wore medical scrubs when they encountered him.  Likewise, witnesses reported that patients received massages from Nerey and others he employed in the place of prescribed physical therapy.  Karla Garcia described Nerey's therapy office as a "very little" building with two small rooms and a lobby located inside a shopping center.

Defendant Nerey also owned and created NPS as a shell corporation to deposit and process kickback payments.  NPS observed no formalities of an established business and paid no taxes, wages, or licensing fees during its

8

existence. The company itself provided no services other than processing payments related to Nerey's patient-recruiting activities, and it enjoyed a 60% profit margin. Nerey also used NPS to pay for fraudulent and forged home health prescriptions, which he obtained mostly through Dr. Hugo Espinosa at Yava Medical Office, Inc. ("Yava Medical") and Karla Garcia at Larkin Community Hospital ("Larkin Hospital").

**E. Recruiting Karla Garcia**

Karla Garcia worked as a medical assistant at Larkin Hospital. She was introduced to defendant Nerey through another patient recruiter identified only as "Alexis." Around October or November 2014, Karla and Nerey met for the first time in a Wendy's parking lot to discuss patient recruiting. At this meeting, Nerey told Karla that he received recruiting kickbacks from Mercy HC and a company called Holistic Home Health. Nerey agreed to pay Karla $150 per prescription and $600 per patient. He explained an approach for recruiting and instructed her on exactly how to forge prescriptions. Nerey later told Karla that it was also necessary to pay patients to keep them quiet.

At some point, Karla's husband also became involved in paying off patients and processing funds through a shell company he created for Karla, Kb Health Consultants, LLC. Karla testified that defendant Nerey offered her husband a job as a "physical therapist" at Sweet Life even though he had no formal training.

9

After Karla and Nerey had a falling out over kickback payments, she began recruiting patients independently for Perez.  Karla was fired from Larkin Hospital in April 2015, but she continued working as a patient recruiter.  The operation at Mercy HC was becoming so successful that, in an effort to slow the amount of money funneled out, the agency had to lower patient admission rates to only those patients who were truly homebound.  Around the same time that Karla entered the business, Perez decided that it was time to expand.

## F.  Joel Alvarez and D&D&D Home Health Care, Inc.

Joel Alvarez became involved in the conspiracy through Jesus Garcia, an above-mentioned associate whose son went to school with Alvarez's daughter. Garcia introduced Alvarez to Perez in a meeting at Mercy HC in November 2014. Nerey was also present at that meeting.  Perez explained aspects of home health services and patient recruiting to Alvarez and asked him to enter the business.

In December 2014, at the behest of Perez, Alvarez provided a capital investment in the amount of $80,000 for the purchase of a new home health agency, D&D&D Home Health Care, Inc. ("D&D&D"), to be owned jointly with Perez and Garcia.  Due to his relative experience and contacts in the field, Perez established the operation and negotiated kickback rates for patient recruiting. At the beginning, D&D&D did not have a sufficient patient volume to be profitable.

10

To get the business off the ground, D&D&D immediately began providing kickbacks to patient recruiters, specifically defendant Nerey.  In fact, the initial efforts to drum up business were facilitated entirely through Nerey.  D&D&D paid kickbacks to Nerey at the same rate negotiated at Mercy HC.  Because of his established book of patients, Nerey was able to negotiate favorable rates with Perez.  Like Mercy HC, all of D&D&D's patients had to be eligible Medicare beneficiaries because the agency was not approved by any other health maintenance organization ("HMO").

In January 2015, Alvarez's wife, Sandra Jaramillo, also became involved in the scheme.  Her role at D&D&D was to manage kickbacks.  Raciel Leon, the manager at Mercy HC, trained Jaramillo to track kickback payments in a logbook. Jaramillo copied Leon's system, and Alvarez later digitized the results in a chart. Nerey described his recruiting efforts to Jaramillo as "filling the nest" for D&D&D.

At trial, Alvarez explained that recruiter kickbacks, a primary illegal aspect of the operation, were often referred to among the group as the "parte negra," which translates from Spanish as the "black part."  Alvarez claims he later discovered that not only were patient recruiters being paid in kickbacks but so were the patients themselves.  Patients involved in the scheme would regularly call D&D&D asking for "flowers," which referred to a promised kickback.  Nerey and

11

others would also use code language for patient kickbacks, as when Nerey told Alvarez that he had "canes in his car" for the patients.

Later still, Alvarez claims that he discovered that patients were not receiving services that were billed by Sweet Life. After patients complained about not receiving therapy services, Daylin Cabrera assured Alvarez and Jaramillo that services were actually being provided. Nerey also claimed that he could handle the problem. In some instances, the invoice for service included the signature of therapists who no longer worked for the company. When challenged, Nerey and Cabrera purportedly changed the signature to another therapist who had not performed the service either. During the conspiracy, Nerey would bring therapist notes into Mercy HC and D&D&D. Nerey later had Cabrera handle this task.

## G. Medicare Investigation and Arrests

At the end of February 2015, Medicare placed Dr. Hugo Espinosa under review. Because Dr. Espinosa was a major source of prescriptions, Nerey was not paid for many of his patients once this occurred. Soon thereafter, Medicare also audited Mercy HC as a result of larger-than-normal patient growth. The government investigation uncovered that many patients did not meet the homebound requirement for home health care and that patients were going to multiple home health care agencies under prescriptions from multiple doctors. Once Medicare halted payments to Mercy HC, Perez continued to transfer Nerey's

12

patients from Mercy HC to D&D&D.  The government investigation undoubtedly created chaos within the operation.  Sandra Jaramillo's testimony suggests that, in March or April 2015, Nerey sought to collect payment from D&D&D on the patients that did not involve Dr. Espinosa.

As the investigation progressed, Perez and Nerey had a phone conversation about whether Yovani Suarez was a confidential informant for the FBI.  The two discussed "breaking [Suarez's] head" because of his cooperation with the government.  Perez testified that Nerey said he went to find Suarez and had "strong words" with him.  Perez testified that Nerey also said he took apart all telephones before speaking with Suarez to "make sure there were no microphones that could have picked up their conversation."  In June 2015, the government began arresting individuals involved in the fraud schemes at Mercy HC and D&D&D.  Raciel Leon purportedly burned his kickback logbook when these arrests began.

## H. Transfer of Funds

At trial, an FBI forensic accountant analyzed the business transactions of the conspiracy through approximately fifteen bank accounts related to persons and entities involved in this case.  In a summary of her findings with respect to Nerey, the accountant explained that "Medicare moneys that were deposited into the home healthcare agencies [Mercy HC and D&D&D and could] then [be] trac[ed] . . . into

13

other entities such as Sweet Life, [NPS] and Carlos Rodriguez Nerey or his d/b/a known as Rodriguez Case Management."

In total, Medicare paid claims submitted by Mercy HC and D&D&D in the amount of $2,366,746—$1,205,324 and $1,161,422, respectively.  In turn, these two home health care agencies paid, among others, Sweet Life, NPS, and Nerey. Sweet Life would then also pay Nerey and NPS.  Between the two home health care agencies and Sweet Life, Nerey and NPS received at least $249,098[1] in checks traceable to claims submitted to and paid by Medicare.  This amount does not include cash payments to Nerey that he did not deposit.

With this factual background, we now turn to the issues on appeal.

## III.   SUFFICIENCY OF THE EVIDENCE

Nerey first contends that the evidence at trial, which came mostly in the form of co-conspirator testimony and corroborating documentation, was insufficient to support his two convictions.  Challenges to the sufficiency of evidence to support a conviction are reviewed de novo.  United States v. Baldwin, 774 F.3d 711, 721 (11th Cir. 2014).  However, the court must view the evidence and all reasonable inferences derived therefrom in the light most favorable to the government.  Id.; United States v. Doe, 661 F.3d 550, 560 (11th Cir. 2011); United

---

[1]This figure does not represent an additional $10,800 transferred to Nerey from Sweet Life that the FBI forensic accountant testified to discovering upon further review.

14

States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001).  Evidence will be deemed

sufficient to sustain a conviction unless "no rational trier of fact could have found

proof of guilt beyond a reasonable doubt."  Diaz, 248 F.3d at 1093 (citing Jackson

v. Virginia, 443 U.S. 307, 322–25, 99 S. Ct. 2781, 2790–92 (1979)).

Here, Nerey was convicted of (1) conspiracy to defraud the United States, in

violation of 18 U.S.C. § 371, by paying and receiving health care kickbacks, in

violation of 42 U.S.C. § 1320a-7b(b)(1)(A), (b)(1)(B), and (b)(2)(A), and (2) the

receipt of kickbacks in connection with a federal health care program, in violation

of 42 U.S.C. § 1320a-7b(b)(1)(A).  Underlying both the conspiracy and the

substantive violation is conduct prohibited by the Anti-Kickback statute.  See

42 U.S.C. § 1320a-7b(b).  Thus, we first address the Anti-Kickback statute and

then discuss its application to each offense.

Section 1320a-7b(b), which is entitled "Illegal remunerations," prohibits the

actual or attempted receipt or payment of kickbacks or other illicit funds in

connection with a federal health care program.  See 42 U.S.C. § 1320a-7b(b).

Subsections (b)(1)(A) and (b)(1)(B) provide as follows:

> (1) whoever knowingly and willfully solicits or receives any
> remuneration (including any kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing
> or arranging for the furnishing of any item or service for which

15

payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

Id. § 1320a-7b(b)(1) (emphasis added).    Subsection (b)(2)(A) provides

similarly that

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

Id. § 1320a-7b(b)(2) (emphasis added).

"For a defendant to be found guilty of conspiracy, the government must prove beyond a reasonable doubt (1) that the conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013)

16

(quotation marks omitted); see United States v. Sosa, 777 F.3d 1279, 1290 (11th Cir. 2015) (quoting same).  The conduct charged in the conspiracy in Count 2 included violations of § 1320a-7b(b)(1)(A), (b)(1)(B), and (b)(2)(A).  Thus, as to the first element of this offense, the government had to show the existence of a conspiracy involving the conduct described in these provisions.

As to the substantive violation of the Anti-Kickback statute in Count 9, which involved only (b)(1)(A), the government had to prove that Nerey (1) knowingly and willfully (2) solicited or received money (3) for referring individuals to a health care provider (4) for the furnishing of services to be paid by Medicare.  See Vernon, 723 F.3d at 1252.

In this case, overwhelming evidence supports Nerey's convictions.  As discussed above, Nerey solicited and paid for home health prescriptions from Larkin Hospital through Karla Garcia and from Yava Medical through Dr. Hugo Espinosa.  In turn, Nerey would then refer patients with these home health prescriptions to Mercy HC and D&D&D in exchange for kickbacks masked as therapy and other professional services.  Mercy HC and D&D&D would use these patients and home health prescriptions to bill Medicare with inflated invoices for services that were technically unnecessary or were never performed.  Once claims were processed by Medicare, Mercy HC and D&D&D would then remit funds to

17

Nerey directly or through NPS, Sweet Life, or by checks made out to and cashed by various co-conspirators.

At trial, four of Nerey's co-conspirators—Jesus Perez, Joel Alvarez, Sandra Jaramillo, and Karla Garcia—testified that Nerey accepted and received kickbacks for referring patients to Mercy HC and D&D&D. Perez, Alvarez, and Jaramillo also each identified checks that they drafted to NPS and Sweet Life to compensate Nerey for recruiting patients. Due to their lack of credibility with other HMOs, Mercy HC and D&D&D only had patients who were eligible Medicare beneficiaries, and so Nerey understood that his recruiting efforts and resulting kickbacks would be tied to and for the purpose of inducing claims filed with Medicare.

Nerey contends that this evidence was insufficient to convict him because the four co-conspirators were cooperating witnesses with the government. This Court has held, however, that "[t]estimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction." United States v. Broadwell, 870 F.2d 594, 601 (11th Cir. 1989). In any event, the testimony in this case was corroborated by a substantial paper trail and forensic analysis of bank accounts accessible solely by Nerey.

The government's forensic accountant traced back to Nerey at least $249,098 worth of checks linked to paid Medicare claims. Once Medicare paid the

18

claims submitted by Mercy HC and D&D&D, these two agencies paid kickbacks to Nerey and numerous other patient recruiters. Yet, Nerey's prolific recruiting led Mercy HC and D&D&D to furnish kickbacks in at least three ways. First, the two agencies would pay Nerey directly, either with cash from another co-conspirator or by checks written to Nerey for "special services." Second, the agencies wrote checks to Sweet Life, which would then funnel that money to Nerey under the guise of therapy services. Third, the agencies would write checks to NPS or another entity owned by Nerey. Nerey would then deposit all checks received into various bank accounts associated with him and his companies.

Nerey also challenges whether the government sufficiently proved willful conduct under the substantive violation. See 42 U.S.C. § 1320a-7b(b)(1)(A). Willful conduct under the Anti–Kickback statute means that the act was "committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." Vernon, 723 F.3d at 1256. In this case, the government showed Nerey's willfulness in a number of ways surrounding his attempts to hide the illegal kickbacks.

First, Nerey sought cash payments to avoid a paper trail. Second, Nerey attempted to funnel his kickbacks through Sweet Life masked as therapy services. Third, conspirators coded recruiter participation in a logbook and referred to

19

kickbacks by code because of their illegal nature.  Fourth, Nerey and Perez agreed to a fallback story in the event of a Medicare audit.  And fifth, Nerey showed consciousness of his guilt through his reaction to the news that Suarez might be a confidential informant by agreeing that he would like to "break his head."

For all of these reasons and after careful review of the trial record, we find that the overwhelming evidence at trial sufficiently supported Nerey's convictions.

## IV.    PROSECUTOR'S CONDUCT

Nerey also argues that the prosecution engaged in misconduct that shifted the burden of proof.  Determinations regarding prosecutorial misconduct involve mixed questions of law and fact and, therefore, are subject to de novo review.  See United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997).

As discussed above, the government in a criminal proceeding has the burden of proving every element of the charged offense beyond a reasonable doubt. United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992).  This being the case, prosecutors must refrain from making arguments that improperly shift the burden of proof to the defendant. Id.  A defendant in a criminal case has no obligation to produce any evidence or to prove his or her innocence.  See id.

Four factors influence a determination as to whether prosecutorial misconduct occurred: "(1) the degree to which the challenged remarks have a

20

tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." United States v. Feliciano, 761 F.3d 1202, 1211 (11th Cir. 2014) (internal quotation marks omitted).

Prosecutorial misconduct justifies a new trial only if the remarks in question were both (a) improper and (b) prejudicial to the defendant's substantial rights. Eckhardt, 466 F.3d at 947; see also United States v. Frank, 599 F.3d 1221, 1237–38 (11th Cir. 2010) (referring to rights as "substantive" rather than "substantial"). Substantial rights are prejudiced when there is "a reasonable probability . . . that, but for the remarks, the outcome of the trial would have been different." Eckhardt, 466 F.3d at 947. Yet, substantial evidence establishing guilt may counteract claims of prejudice. See United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) ("[Defendant] cannot show prejudice in the face of the overwhelming evidence of his guilt.").

Likewise, the district court may negate prejudice from the improper comments by issuing a curative instruction. Simon, 964 F.2d at 1087 ("This court has held that the prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof."); see also United States v. Gonzalez, 122 F.3d 1383, 1389 (11th

21

Cir. 1997) (finding no substantial prejudice where district court sustained defense counsel's objections and gave a curative instruction).  The jury is presumed to have followed such a curative instruction by the district court.  United States v. Wilson, 149 F.3d 1298, 1302 (11th Cir. 1998).

In this case, defendant Nerey points to five instances of alleged misconduct by the prosecution.  Defense counsel objected on each occasion.  First, during the redirect examination of Jesus Perez, the prosecution inquired whether defense counsel "ask[ed] anything at all about conversations that [Perez] had with [Nerey] about kickbacks that [Perez] paid."  Nerey argues that this question was improper because it implied that defense counsel should have asked such a question. Whether proper or not, we cannot say that asking this question shifted the burden of proof on redirect examination.

The other four challenged instances were comments that occurred during closing argument.  The second and third instances both involved the prosecutor's reference back to what defense counsel had said in his opening statement.  In the second instance, the prosecution argued in closing the following:

> There is no dispute here that D&D&D and Mercy committed fraud from the day they opened their doors until the day their operation was cut short in June 2015 by a series of arrests.  Defense counsel, he agreed with this in his opening statement but he said it was just a coincidence that the defendant happened to work there too.  To accept his version of the facts[,] the defendant profited off the scheme.

22

In the third instance, the prosecution commented that "[t]his is a federal crime and this is the crime charged in Count 9 of the indictment. [Defense counsel] told you in his opening—." Mid-sentence, defense counsel objected to this characterization of his opening statement. On this ground, the district court overruled the objection. The prosecution continued: "[Defense counsel] told you in his opening statement that these two home healthcare companies were total frauds and there was no doubt that this scheme hinged on an army of patient recruiters." Defense counsel never renewed the objection as to the complete sentence.

The second and third instances were not improper because they were in fact consistent with defense counsel's opening statement that "[n]ow, I'm not saying that fraud did not occur [at Mercy HC and D&D&D] because it did. What I'm saying is that Carlos Rodriguez Nerey was not involved in that fraud." Defense counsel also mentioned Nerey's co-defendants, saying: "They're going to tell you that they committed fraud, and they are going to want you to believe that Carlos committed fraud with them, these cooperating witnesses, as the prosecutor mentioned earlier." Defense counsel continued: "All of these individuals who you're going to hear from, the cooperating witnesses, the motivating witnesses, they're all friends. The only outsider is Carlos. The evidence will show this."

23

We now review the fourth and fifth challenged comments.  As to the fourth, again in closing argument, the prosecution urged the jury to focus on the FBI analyst's chart and stated that defendant Nerey "can't explain this.  He can't explain why he got a quarter of a million dollars off this scheme."  The prosecution's fifth and final comment provided, "Now, you will hear from the defendant's attorney that you shouldn't believe those witnesses because they are all friends and they all got together."  While this final comment does not even arguably shift the burden, the fourth comment was potentially burden shifting.  But, importantly, after comments four and five, the district court provided separate curative instructions as to the burden of proof in a criminal case.

After sustaining an objection to the fourth comment, the district court stated: "Again, ladies and gentlemen, the burden is always on the Government to prove the defendant guilty beyond a reasonable doubt.  The defendant doesn't have any burden at all."  After the fifth comment, the district court sustained defense counsel's objection and reiterated the government's burden:

> I do want to say, once again, ladies and gentlemen, as I said during jury selection and at different times throughout the trial, the Government, having brought the charges, has the burden of proving defendant guilty beyond a reasonable doubt.  No defendant in a criminal case ever has the burden of proving his or her innocence. The defendant has no burden whatsoever in the trial, only the Government.

24

Here the challenged comments, some of which were perhaps improper, did not amount to reversible misconduct by the prosecution. Four out of the five comments pointed to by Nerey occurred relatively close to one another <u>during closing argument</u>. The district court followed four of the challenged actions by sustaining defense counsel's objection and the last two by issuing a curative instruction. See <u>Gonzalez</u>, 122 F.3d at 1389. Given the temporal proximity of the comments to one another and the district court's curative instructions, it is unlikely that these comments, even taken together, served to "permeate[] the entire atmosphere of the trial," which began and ended with a discussion of the government's clear burden. <u>Simon</u>, 964 F.2d at 1086. The jury is presumed to follow curative instructions by the district court. <u>Wilson</u>, 149 F.3d at 1302.

Likewise, as discussed above, the government presented overwhelming evidence of Nerey's guilt in this case. Notwithstanding the prosecution's comments and the district court's curative instructions, the jury had more than sufficient evidence to find Nerey guilty of the charged crimes. <u>McLean</u>, 138 F.3d at 1403 ("[Defendant] cannot show prejudice in the face of the overwhelming evidence of his guilt."). Thus, a substantial right of Nerey was not prejudiced because it is improbable that the verdict in this case would have been different but for the prosecution's comments. <u>Frank</u>, 599 F.3d at 1237–38.

25

## V.    MOTION TO INTERVIEW A JUROR

Nerey next argues that the district court improperly denied his motion for leave to interview juror number four after the verdict.  The denial of a motion to interview a juror is reviewed for an abuse of discretion.  United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir. 1990) ("The district court has discretion to determine whether evidence of premature deliberation warrants an evidentiary hearing."); see United States v. Orisnord, 483 F.3d 1169, 1179 (11th Cir. 2007); United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991).

In the context of an inquiry into the validity of a verdict or indictment, the Federal Rules of Evidence prohibit a juror from testifying about (1) "any statement made or incident that occurred during the jury's deliberations;" (2) "the effect of anything on that juror's or another juror's vote;" or (3) "any juror's mental processes concerning the verdict or indictment"  Fed. R. Evid. 606(b)(1).  A juror may testify, however, about whether "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made entering the verdict on the verdict form."  Fed. R. Evid. 606(b)(2).

Under Southern District of Florida Local Rule 11.1(e), after the jury is discharged and upon proper motion, the district court, "for good cause shown[,] . . . . *may* allow counsel to interview jurors to determine whether their

26

verdict is subject to legal challenge," and may limit the time, place and circumstances under which the interviews may be conducted. S.D. Fla. L.R. 11.1(e) (emphasis added). This Court has construed the "good cause" requirement to mean satisfaction of one of the exceptions listed in Rule 606(b). United States v. Griek, 920 F.2d 840, 842 (11th Cir. 1991). With respect to this same local rule, we have upheld a district court's denial of an interview where one juror called the defendant to say "we were pressured into making our decision." Cuthel, 903 F.2d at 1382.

A party's ability to interview a juror exists on a spectrum, which is dependent upon the nature of the alleged misconduct. See United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985). On one end, serious accusations usually require investigation. Id. On the other, speculative and unsubstantiated allegations present little need to investigate. Id.; see United States v. Sun Myung Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) ("It hardly bears repeating that courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.").

To obtain a new trial based on juror non-disclosure, the challenging party must demonstrate that (1) the juror failed to answer honestly a material question on voir dire and that (2) a correct response would have provided a valid basis for a

27

challenge for cause. United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984). The party seeking a new trial in this context must also show actual bias of the juror. Id. at 1532; see also Carter v. Jones, No. 08-civ-1119-C, 2010 WL 3023381, at *10 (W.D. Okla. May 28. 2010) (finding petitioner offered "nothing but his own speculation" to support a claim that the juror was biased based on his choice to wear a red shirt—the color of the Bloods, which was the victim's gang—during voir dire), adopted by, 2010 WL 3023374 (W.D. Okla. July 28, 2010).

In this case, juror number four answered "no" to all questions of bias in his juror questionnaire and, during voir dire, "no" as to whether he had "any reason why [he] could not sit as a fair and impartial juror." When the jury reached its verdict on April 1, 2016, juror number four walked into the jury box wearing a fluorescent green T-shirt with bold, black letters stating "American Greed." This also happens to be the name of a television program aired on CNBC relating to white collar crimes.

After the jury's verdict and later that day, Nerey's counsel filed a motion to interview juror number four based on his wearing the T-shirt. In his motion, Nerey explained that T-shirts for the program are sold over the internet and are promoted with the idea that you can "show the world that you're no sucker." Nerey contended that juror number four's T-shirt demonstrated his intent to make a statement to and exert potential influence on his fellow jurors and that this conduct

28

adequately showed an "outside influence" to justify an interview of juror number four. Fed. R. Evid. 606(b)(1)(B).

In its response brief, the government pointed out that Nerey did not object to or question juror number four's attire when the verdict was rendered. While Nerey's counsel filed the motion later that day, the motion did not set forth the questions to be asked of juror number four. For its part, the government also included an undisputed factual proffer that this particular T-shirt (green with black letters) was not one sold by the television program. On April 13, 2016, the district court denied Nerey's motion by docket order, stating that "defendant has not shown good cause to delve into the jury's deliberations."

On appeal, Nerey renews these arguments and contends that juror number four's shirt suggested that he lied about impartiality. Nerey urges that an interview was justified. Yet, as established by filings in the district court, Nerey failed in his motion to lay out the questions he intended to ask or to establish that the T-shirt in question can even be linked with the television program. Even assuming arguendo there was some connection, it is unlikely that juror number four is the only juror to have seen, or enjoyed, primetime television depicting criminal activity in a negative light.

A juror's wearing a T-shirt that refers to one of these television programs does not prove his inability to serve as an impartial juror or to follow the

29

instructions of the court.  Additionally, it is worth noting that juror number four wore this T-shirt in the presence of other jurors for at most only a few hours on the second day of deliberations.  His choice of clothing, while perhaps juvenile and imprudent, does not bring into question the validity of the jury's verdict, which was unanimous.  The district court did not abuse its discretion by denying Nerey's motion to interview the juror.

## VI.    RULE 404(b) EVIDENCE

Defendant Nerey argues that the district court erred by admitting various types of Rule 404(b) evidence at trial.  See Fed. R. Evid. 404(b).  The district court's decision to admit or exclude evidence is reviewed for an abuse of discretion.  See, e.g., United States v. Eckhardt, 466 F.3d 938, 946 (11th Cir. 2006); United States v. Matthews, 431 F.3d 1296, 1310–11 (11th Cir 2005); United States v. Henderson, 409 F.3d 1293, 1297 (11th Cir. 2005).

Federal Rule of Evidence 404(b) provides generally that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show" action in conformity therewith.  Fed. R. Evid. 404(b)(1).  However, under Rule 404(b)(2), such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  As to this

30

second provision, Rule 404(b) is a rule of inclusion.  See Eckhardt, 466 F.3d at 946.

To be admissible under Rule 404(b)(2), a prior act (1) must be relevant to an issue other than defendant's character, (2) must be sufficiently proven to permit a jury determination that the defendant committed the act, (3) must have probative value that is not substantially outweighed by undue prejudice, and (4) must otherwise satisfy Federal Rule of Evidence 403.  Eckhardt, 466 F.3d at 946. Extrinsic evidence of a crime, wrong, or other act is inherently prejudicial to the defendant because it risks a jury's convicting the defendant for the extrinsic offense or conduct rather than the charged one.  See United States v. Baker, 432 F.3d 1189, 1205 (11th Cir. 2005) (citing United States v. Beechum, 582 F.2d 898, 910 (5th Cir. 1978) (en banc)).

Yet, Rule 404(b) does not apply where the evidence of other crimes, wrongs, or acts constitutes res gestae.  See United States v. Troya, 733 F.3d 1125, 1131–32 (11th Cir. 2013) (concluding that shooting into residence was inextricably intertwined with evidence regarding charged drug conspiracy); United States v. McLean, 138 F.3d 1398, 1403–04 (11th Cir. 1998) (holding that prior drug dealing was inextricably intertwined where it explained the relationship between the defendant and a witness and was needed to assess the witness's credibility).  In other words, such evidence need not meet a category listed in 404(b)(2) to be

31

admissible.  Evidence meets this exception when it is (1) part of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.  Baker, 432 F.3d at 1205 n.9; see also McLean, 138 F.3d at 1403 ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." (quoting United States v. Williford, 764 F.3d 1493, 1499 (11th Cir. 1985)).

Lastly, Rule 403 allows a district court the discretion to exclude evidence if "its probative value is substantially outweighed by [the] danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  It is recognized, however, that Rule 403 "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." United States v. Lopez, 649 F.3d 1222, 1247 (11th Cir. 2011) (quoting United States v. Alfaro-Moncada, 607 F.3d 720, 734 (11th Cir. 2010)); United States v. Jernigan, 341 F.3d 1273, 1285 (11th Cir. 2003) (noting that "we are loathe to

32

disturb the sound exercise of [the district court's] discretion" in Rule 403 determinations).

Before the trial in this case, the district court verbally denied defendant Nerey's motion in limine to exclude evidence of (1) his conduct with other home health care agencies, (2) his knowledge of the fraud at Mercy HC and D&D&D, and (3) his confronting Yovani Suarez as a cooperating witness. The district court found all of this evidence was relevant, probative, and inextricably intertwined with the charged counts. Alternatively, the district court found that the evidence was admissible under Rule 404(b)(2) to show motive and lack of mistake.

On appeal, Nerey argues that the district court improperly admitted each of these three items of evidence. Nerey attacks each item separately as to whether it satisfied Rule 404(b) or the "inextricably intertwined" exception. In either event, Nerey argues the evidence should have been excluded under Rule 403.

As to the first item, Nerey contends that evidence of his "alleged involvement in other home health care agencies is not inextricably intertwined with the receipt of kickbacks evidence as they are not part of the same series of transactions." This argument misses the mark. "Inextricably intertwined" and "same transaction" are two separate exceptions to the same rule against impermissible extrinsic evidence. See McLean, 138 F.3d at 1403 (listing three exceptions separated by "or").

33

Evidence of Nerey's involvement with other home health care agencies, to the extent it was admitted, was inextricably intertwined with, and probative of, how Nerey became involved with the home health care agencies in this case and why they trusted him as a patient recruiter.  See McLean, 138 F.3d at 1404 ("[T]he record makes clear . . . that [evidence of defendant's involvement in a separate criminal organization] was vital to an understanding of the context of the government's case against [defendant] and, therefore, can be said to be 'inextricably intertwined' with the government's proof of the charged offenses."). Any testimony by Jesus Perez that he knew Nerey from other home health care agencies goes directly to this point.[2]  Likewise, Karla Garcia's testimony that she worked with Nerey at an agency other than Mercy HC explained how they came to know each other and was inextricably intertwined with the evidence regarding Nerey's involvement in patient recruiting.  All of this evidence was also "necessary to complete the story of the crime."  Id. at 1403; see Lopez, 649 F.3d at 1247–48

---

[2]In its response brief, the government points out that some anticipated testimony by Jesus Perez is missing from the trial transcripts and that attempts to obtain the missing testimony have been unsuccessful.  The government argues that Nerey did not mention Perez's testimony in his initial brief and thus he has waived the issue.  We agree. See United States v. Levy, 379 F.3d 1241, 1242 (11th Cir. 2004) ("[W]e do not entertain this new issue because [appellant] did not timely raise it in his initial brief on appeal.").  In addition, the appellant bears the burden to complete the record on appeal, and Nerey has not proffered the missing testimony that he contends was inadmissible.

Alternatively, even if the issue is preserved and the missing testimony is, as Nerey argues, the fact that Perez and Nerey met at another home health care agency engaged in similar fraud, we conclude that such testimony was properly admitted under Rule 404(b) for the reasons already explained above.

34

(concluding that co-conspirator testimony regarding prior or similar criminal involvement of the defendant provided context of the conduct charged and was not unduly prejudicial).

As to the second item, Nerey argues that evidence of his knowledge and involvement in aspects of the fraud committed at Mercy HC and D&D&D does not meet the standard for admissibility under Rule 404(b).  Nerey was charged in this case with a conspiracy to defraud the United States by paying and receiving health care kickbacks and receiving kickbacks in connection with a federal health care program.  However, the full extent of the conspiracy in which he was involved was much larger than that.  Mercy HC and D&D&D were in the business of recruiting patients who had forged or paid-for home health prescriptions and then billing Medicare for services either not performed or not medically necessary.  Showing Nerey's involvement as a patient recruiter who received kickbacks, many of which were masked by his operations with Sweet Life, required an explanation of his knowledge and involvement in these other aspects of the larger conspiracy to defraud.  Because Nerey insisted that all of his patients be assigned to Sweet Life for therapy, it was also important to explain how Sweet Life was involved in order to show Nerey's willful conduct and explain the full extent of his relationship with the other co-conspirators.

35

As to the third item, Nerey argues that evidence of his confronting Suarez is "also not inextricably intertwined with any evidence related to receipt of kickbacks since it does not arise out of the same transactions and it isn't necessary to complete the story for the jury." However, one conclusion does not follow from the other. These are separate and independent categories of res gestae evidence. See McLean, 138 F.3d at 1403 (denoting "same transaction" and "necessary to complete the story" as separate categories from "inextricably intertwined"). This once again shows a fundamental misunderstanding about the application of this exception to Rule 404(b).

Nerey also contends that evidence that a "man fitting Nerey's description" approached and spoke to Suarez is not sufficient evidence under Rule 404(b) and is not relevant to prove or disprove the receipt of kickbacks. While the government included this evidence in its notice of intent to introduce 404(b) evidence, it never came up at trial. Suarez did not testify, and the testimony about a "man fitting Nerey's description" was never introduced.

At trial, Jesus Perez testified about a phone call with Nerey where they discussed whether Suarez was a confidential informant. Angered at the thought, the two discussed "breaking [Suarez's] head." This interaction does not go to prove Nerey's general character for violence. Rather, it was offered to show Nerey's specific intent to engage in the conspiracy to receive kickbacks at Mercy HC and

36

D&D&D or to take steps to protect himself.  See United States v. Vernon, 723 F.3d 1234, 1256 (11th Cir. 2013) (defining willfully as an act "committed voluntarily and purposely, with the specific intent to do something the law forbids").

This testimony helped to establish Nerey's willful involvement in the scheme and an absence of mistake about the health-care-fraud conspiracy.  An individual who mistakenly accepted kickbacks would not feel anger or aggression toward a purported government informant.  Likewise, the testimony was probative and not unduly prejudicial because it did not suggest actual violence but merely that Nerey went to find Suarez and had "strong words" with him.  See also Baker, 432 F.3d at 1220 ("Although prejudicial, '[c]ourts may consider evidence of threats to witnesses as relevant in showing consciousness of guilt' under Rule 404(b)." (alteration in original)).

The district court did not err by admitting the challenged evidence.  Even if we were to find some error, the overwhelming evidence of Nerey's guilt counsels against reversing his convictions on this evidentiary ground.  United States v. House, 684 F.3d 1173, 1197 (11th Cir. 2012) (declining to reverse conviction on evidentiary error "if the error had no substantial influence, and enough evidence supports the result apart from the phase affected by error" (internal quotation marks omitted)).

37

## VII.  NEREY'S SENTENCE

As to his sentence, Nerey argues that the district court incorrectly calculated his advisory guidelines range based on an improper benefit to be conferred in the amount of $2,366,756.  In its guidelines calculations, the district court's factual findings are reviewed for clear error.  United States v. Lebowitz, 676 F.3d 1000, 1015 (11th Cir. 2012).  The district court's interpretation and application of the Guidelines is reviewed de novo.  Id.; United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006).

The presentence investigation report ("PSI") calculated Nerey's base offense level as eight under U.S.S.G. § 2B4.1(a).  The PSI determined that Nerey was involved in the conspiracy at Mercy HC and D&D&D from October 2014 to September 2015; that his acts contributed to the submission of fraudulent claims to Medicare; and that he made more money from his role in the conspiracy than the owner of Mercy HC, Jesus Perez.  The PSI concluded that Nerey was responsible for the entire amount of the improper benefit conferred on Mercy HC and D&D&D.

In addition to the base offense level of eight, the PSI recommended: (1) a sixteen-level increase pursuant to U.S.S.G. § 2B4.1(b)(1)(B) and § 2B1.1(b)(1)(I) because the benefit conferred by the conspiracy was between $1,500,000 and $3,500,000; and (2) a three-level increase under U.S.S.G. § 3B1.1(b) because of

38

Nerey's significant role in the conspiracy.  See U.S.S.G. § 3B1.1(b) (discussing aggravating roles including "organizer, leader, manager, or supervisor in any criminal activity").  Nerey objected to the PSI's increases.  Nerey argued that he should be held responsible only for the $249,098 he received in kickbacks because he did not agree to commit fraud in relation to the patients he did not recruit and that he was not an organizer of the conspiracy but merely one patient recruiter.

The district court found that Nerey was "pretty involved" in the conspiracy and that he knew what the other co-conspirators were doing.  It found that Nerey recruited Karla Garcia into the conspiracy and that her involvement in the fraud was foreseeable to him.  Ultimately, the district court found that the trial evidence supported the $2,366,746 figure and the sixteen-level increase.  The district court declined to impose a three-level increase for Nerey's role in the conspiracy.

On appeal, Nerey argues that the district court incorrectly determined that the value of the benefit conferred was $2,366,746.  See U.S.S.G. § 2B4.1(b)(1)(B).  Specifically, Nerey argues that he was only one of many patient recruiters at Mercy HC and D&D&D and that he was not involved in their actual submission of fraudulent claims to Medicare.  Nerey also argues that he did not agree to commit fraud with any patients he did not recruit and that the improper benefit conferred should be based on his personal kickbacks rather than the amount fraudulently billed for the entire conspiracy.

39

The application notes for § 2B4.1 provide that the "value of the improper benefit to be conferred" means "the value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 cmt. n.2.  In the case of jointly undertaken criminal activity, the relevant conduct includes acts and omissions of others that were (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity.  U.S.S.G. § 1B1.3(a)(1)(B); see also United States v. Valarezo-Orobio, 635 F.3d 1261, 1264 (11th Cir. 2011) ("Whether a co-conspirator's act was reasonably foreseeable to the defendant so that it qualifies as relevant conduct is a question of fact reviewed for clear error.").

As to the scope of jointly undertaken criminal activity, Nerey was significantly involved in the overall conspiracy.  Nerey was the top source of patients for both Mercy HC and D&D&D.  Nerey also recruited Karla Garcia to the conspiracy as an additional patient recruiter and attempted to recruit Karla's husband as a fraudulent physical therapist.  Nerey cross-referenced his patient list with the logbooks at D&D&D, negotiated payments for other recruiters, and paid other conspirators through NPS.

With respect to conduct in furtherance of the conspiracy, all of the kickbacks to Nerey were made possible by the fraudulent Medicare claims filed by various co-conspirators at Mercy HC and D&D&D.  Nerey was aware that his receiving

40

payment would require the filing of claims to Medicare.  Mercy HC and D&D&D were not approved by any other HMO and could submit claims only to Medicare.  Thus, Nerey recruited patients with these limitations in mind.  Mercy HC and D&D&D submitted patient claims using inflated invoices for home health care.  Once Medicare processed and paid these claims, Mercy HC and D&D&D would pay kickbacks to Nerey based on the number of his patients that led to successful claims.  Mercy HC and D&D&D compensated recruiters only for their patients' claims that Medicare accepted and paid.  As such, the filing of these Medicare claims was in furtherance of and necessary to Nerey's receiving kickbacks.  U.S.S.G. § 1B1.3(a)(1)(B).

It was also reasonably foreseeable that Nerey's co-conspirators would take the home health prescriptions, patients, and recruiters that Nerey procured and use them in the scheme to file fraudulent Medicare claims.  As such, Nerey's conduct encompasses the entire amount of $2,366,746 received from the conspiracy.  The district court's determination as to the improper benefit conferred was not clearly erroneous.

## VIII.  CONCLUSION

For all of these reasons, we affirm Nerey's convictions and sixty-month total sentence.

**AFFIRMED**.

41