NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0430.   WILSON v. THE STATE.

WARREN, Presiding Justice.

Appellant Andrew Wilson was convicted of malice murder and other crimes in connection with the asphyxiation by smothering of Gregory Harris.  In this appeal, Wilson argues that the trial court abused its discretion by admitting under OCGA § 24-4-404 (b) evidence of a prior armed robbery involving Wilson.  As explained more below, we conclude that the trial court did abuse its discretion by admitting the evidence of Wilson's prior armed robbery and that the error was not harmless.  We therefore reverse Wilson's convictions.

We also conclude, however, that the evidence was constitutionally sufficient to support the jury's guilty verdicts on all counts except for the count of theft by receiving stolen property.  As

a result, Wilson may be retried on all counts except this theft-by-receiving count. And because there is at least one legal issue that is likely to recur if Wilson is re-tried,[1] we address Wilson's claim that the trial court erred by denying his motion to suppress evidence derived from his cell phone records and conclude that the trial court did not err in denying the motion.[2]

1. *Background*

---

[1] Wilson also raises several other claims on appeal. Because we reverse Wilson's convictions, we do not address these other enumerations, which are either moot or unlikely to recur upon re-trial. See *Sheard v. State*, 300 Ga. 117, 121 n.5 (793 SE2d 386) (2016).

[2] Harris's body was found on July 14, 2012. On December 21, 2012, a Fulton County grand jury indicted Wilson and Edgar Hubbard for malice murder (Count 1), felony murder based on kidnapping (Count 2), kidnapping with bodily injury (Count 3), first-degree arson (Count 4), and theft by receiving stolen property (Count 5). Hubbard was tried first and found guilty of only one count: arson. Wilson was tried separately from December 10 to 18, 2015, and the jury found him guilty of all counts. The trial court sentenced Wilson to serve life in prison without the possibility of parole for Count 1, 20 years for Count 4, and 20 years for Count 5, running concurrently with each other. Count 2 was vacated by operation of law, and the trial court merged Count 3. Wilson filed a motion for new trial, which he amended three times with new counsel. After an evidentiary hearing, the trial court entered an order denying the motion on July 11, 2023. Wilson filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2024 and was orally argued March 18, 2025.

On the evening of July 13, 2012, Harris's family members found his house in disarray, appearing as though it had been robbed, and they could not find Harris. Early the next morning, Harris's burned vehicle was found in the backyard of a vacant home, and his body was found bound and burned in his trunk. Wilson and Hubbard were ultimately arrested for Harris's murder and other related crimes. The State's theory of the case was that Wilson met Harris at Onyx gentleman's club in Atlanta and targeted Harris as a robbery victim because of Harris's apparent wealth, which Harris generated by selling drugs, including marijuana, cocaine, and heroin. Because of Harris's visible affluence, Wilson worked with Edgard Hubbard to steal (among other items) two expensive watches from Harris. According to the State, Wilson and Hubbard—as part of their robbery plan—stole Harris's watches, kidnapped him from his home, bound and suffocated him, put him in the trunk of his car, drove the car to a vacant home, and set the car on fire with Harris's body in the trunk. In addition to presenting evidence of Wilson's involvement in Harris's murder, the State advanced its

theory of Wilson's robbery scheme by introducing evidence that in 2011, Wilson committed a separate armed robbery against John Taylor—a man the State said Wilson met at Onyx—and stole, among other items, an expensive watch.

(a)  The evidence presented at trial showed the following.[3] Harris and Wilson knew each other.  Harris's fiancée testified that she had seen Harris and Wilson interact at least twice, first at a restaurant when Wilson approached the couple and engaged Harris in "friendly" conversation and later when she saw Wilson and Harris "standing together, just in the same area[,]" at Onyx.  Harris's fiancée also testified that Wilson and Harris "would talk on the phone," and Harris would occasionally mention to her that he was "going to meet [Wilson] somewhere," but she did not know where they would go.  Harris and Wilson (as well as Hubbard) were originally from Detroit, Michigan, but each relocated to Georgia at

---

[3] Because our analysis involves questions of whether a trial court error was harmless, we lay out the evidence in detail and do not do so in the light most favorable to the jury's verdicts.  See *Ensslin v. State*, 308 Ga. 462, 462 n.2 (841 SE2d 676) (2020).

4

different times, where they eventually settled permanently.

Phone records showed that,[4] on July 12, 2012, Harris's phone subscribed to Metro PCS[5] and Wilson's phone subscribed to AT&T exchanged several calls throughout the night. Wilson had an additional phone that was subscribed to Metro PCS that exchanged several calls with Hubbard's phone that night.[6] At the time the calls were made, surveillance video showed that Harris was at his home in Newton County, and cell-phone location data showed that Wilson's and Hubbard's phones were near Harris's home.[7] This was one of only two times within the month surrounding Harris's murder

---

[4] As explained in Division 4, we conclude that the trial court did not err when it denied Wilson's motion to suppress his cell phone records and the data derived from those records.

[5] Harris also had another phone that was subscribed to Sprint.

[6] Phone records showed that Wilson's AT&T number was registered under his name, but Hubbard testified that he frequently talked to Wilson on his Metro PCS number, which was subscribed to a fictitious name. Wilson's two phone numbers were saved in Hubbard's phone as "Andy" and "Andy Two," and Hubbard testified that both of these contacts referred to Wilson.

[7] A records custodian testified at trial that the cell phone location data could not pinpoint the exact location of a phone but rather indicated that a phone was in the vicinity of a tower. He testified that in a densely populated area, a phone would likely be within half a mile to two miles from a tower.

that Wilson's phones were in that area, with the second time being the next day.

On the morning of July 13—the day before Harris's body was found—Wilson's AT&T phone called Harris's Metro PCS phone twice, at 8:56 a.m. and 9:46 a.m. At the time the second of these calls was made, Harris was in the car with his girlfriend. His girlfriend testified at trial that Harris answered a call and told someone that "he was coming," but she did not know to whom he was talking. Harris left his girlfriend at 11:09 a.m., and the location of his cell phones indicated that he began driving toward Cobb County around noon. Between 12:05 and 12:06 p.m., Wilson's AT&T phone exchanged four calls with Harris's Metro PCS phone. From 12:12 to 1:00 p.m., Harris's phone locations were stationary in Cobb County. Wilson's and Hubbard's phones were in the same location during the same period. At 12:38 p.m., Harris's Sprint phone was turned off. The last call made from or answered by either of Harris's phones was made by Harris's Metro PCS phone to Wilson's AT&T phone at 1:06 p.m. Around that time, Harris's and Wilson's Metro PCS

phones began traveling toward Harris's home in Newton County.[8]

Surveillance video showed that Harris's black sedan returned to Harris's house at 1:46 p.m., but because the car windows were tinted, the driver of the vehicle was not apparent from the video. Around 2:00 p.m., Harris's Metro PCS phone was turned off. Cell-phone location data showed that Wilson's Metro PCS phone was near Harris's house from 2:00 p.m. to 2:23 p.m. and that around that time it exchanged several phone calls with Hubbard's phone. At 2:27 p.m., surveillance video showed Harris's sedan leaving his house. At the same time, Wilson's Metro PCS phone began traveling from Newton County toward Atlanta. Throughout the rest of the day on July 13, Wilson's Metro PCS phone and Hubbard's phone exchanged several calls.

Around 7:00 p.m., Harris's sister and fiancée, who were concerned because Harris had not answered his phones, went to Harris's house. They used a spare key to get into the home, and as

---

[8] Wilson's AT&T phone remained in Cobb County and called Harris's Metro PCS phone from this location with no answer at 2:34 p.m., 2:35 p.m., and 5:05 p.m.

soon as they walked in, they smelled a "strong odor of bleach." Inside the kitchen, they saw Harris's two cell phones submerged in a bucket of bleach. Harris's bedroom was in "complete [] disarray." Empty watch boxes were on the floor, and Harris's expensive cologne, designer clothing, iPad, firearm, and two luxury watches – a Rolex and an Audemars Piguet – were missing. Harris's sister and fiancée called 911 and filed a missing person's report around 8:00 p.m.

Around 11:30 p.m. in Fulton County, two men saw a white Corvette stop in front of them. They saw a man step out of the driver's seat, inspect the car, get back inside the car, and drive off. There did not appear to be anyone else in the vehicle. At trial, one of the witnesses, who was 5'11", said that the man he saw get out of the white Corvette may have been "about [his] height, maybe a little bit higher."

Around 15 to 30 minutes later, the two men saw smoke coming from the direction that they saw the white Corvette drive toward. As they approached the area, they saw a car on fire in the backyard

8

of an abandoned house. The car was later identified as Harris's black sedan. They did not see anyone around the house. They called 911. The Atlanta Fire Department arrived, and after containing the fire, firefighters searched the car and found a body that was severely burned in the trunk. The body was later determined to be Harris. Harris's hands and legs were bound behind his back; there was wiring around his wrist and ankles; and there was plastic around his nose and mouth and a piece of fabric around his head, holding the plastic in place.

Later testing determined that the vehicle fire was started with gasoline, and an Atlanta Fire Department Investigator testified that the fire was a result of arson. At trial, the medical examiner testified that Harris's manner of death was homicide caused by asphyxia due to smothering. Because there was no soot in Harris's airways, the medical examiner concluded that he died before being burned.

Investigation into Harris's murder revealed that in the early morning of July 14—around the time the car fire was discovered—Wilson's and Hubbard's phones were near the location of the car fire

9

and exchanged seven calls. In total, Wilson's and Hubbard's phones exchanged over 50 calls from around 9:00 a.m. on July 13 to around 3:00 a.m. on July 14. On July 16, two days after Harris's burned car was discovered, Wilson's phones were in Detroit and remained there until July 20. On July 20, Wilson changed the number for his AT&T phone. Hubbard was also in Detroit around this time; the general manager of a pawn store in Detroit testified that on July 17, Hubbard made a payment on a loan he owed at the store and also pawned a watch.[9] Evidence also showed that Hubbard and Wilson had previously been customers of this store, though Wilson's last transaction at the store was in 2008, and Hubbard's last transaction before the July 17 pawn was in 2005.

The State also presented evidence that in December 2011 and July 2012, Harris bought from this store the Rolex and the Audemars Piguet watches that were later stolen from him. At trial, the store manager testified that Harris's stolen watches were

---

[9] The State did not present any evidence at trial that this watch matched either of the watches stolen from Harris.

appraised as being worth $32,500 and $110,000, respectively. The store manager was also shown a photo from Hubbard's phone that was taken on July 17, 2012, and the manager testified that the watch Hubbard wore in the photo matched the description of Harris's stolen Rolex. No evidence was presented about where this photo was taken.

After further investigation, Wilson and Hubbard were arrested in Georgia in September 2012. Wilson admitted to investigators that he knew Harris and that they "used to hang out." Wilson said that he had previously been in both of Harris's cars[10] and that he saw Harris "like two days before" July 13. Wilson also said that both he and Harris owned Audemars Piguet watches, but that Wilson had sold his recently. When asked if Wilson had ever been to Harris's home, Wilson said, "I don't want to answer that question." Ultimately, Wilson denied having any involvement in Harris's killing, claiming that he and Harris "had no beef." Pursuant to a search warrant, investigators obtained Wilson's AT&T phone, which

---

[10] In addition to his sedan, Harris owned a sports car.

11

had been "wiped clean," meaning that no information was able to be recovered from the device. Investigators also discovered that Hubbard and his wife shared a white Corvette that matched the description of the car seen before Harris's black sedan was discovered on fire.

At trial, Wilson argued that he was not involved with any of the crimes against Harris. He elicited testimony from the lead investigator that he "could not say"[11] Wilson committed these crimes and that there was no physical or forensic evidence that indicated that Wilson was in Harris's house on July 12, 13, or 14 or that Wilson had been near Harris's car when it was set on fire. Wilson also presented evidence of potential alternate suspects, including that investigators received information that three people were coming from Detroit to meet Harris to complete a drug deal and that someone from California was supposed to be transporting drugs to Tennessee for Harris. Additionally, the witnesses who saw the

---

[11] Wilson's counsel asked the investigator if he could say Wilson committed the charged crimes, and the investigator responded, "No. sir."

white Corvette near where Harris's car and body were found in Fulton County testified that they did not think the man they saw get out of the car was Wilson.

(b) Prior to trial, the State gave Wilson notice that it would seek to introduce evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") of the 2011 armed robbery in the condominium of John Taylor, a wealthy Atlanta businessman, that involved Wilson. During a pretrial hearing, the State asserted that the 2011 armed robbery showed Wilson's motive, identity, absence of mistake or accident, and common plan or scheme with respect to the charged crimes. Wilson objected, arguing that the 2011 armed robbery was not relevant for any of those purposes. The trial court admitted the evidence to show motive and common plan or scheme, but not to show identity and absence of mistake or accident. And in admitting the evidence, the trial court stated that it "f[ound] in particular that [the evidence was] relevant to show . . . that the accused finds out what people have, sets them up to be robbed, steals jewelry and small items, clothes and . . . multiple people are involved."

13

At trial, Taylor and Andre Paulino, Taylor's condo cleaner, testified. Their testimony included the following: in early 2011, Wilson contacted Taylor's sister and offered to sell her designer handbags at a discount. Because she wanted to buy a handbag from Wilson, she and Taylor met Wilson in the parking lot of Onyx to complete the transaction. When they arrived, Wilson was there with three or four other men. Taylor, who drove a luxury sedan, handed Wilson $10,000 in cash for four handbags. At the time he handed Wilson the money, Taylor was wearing a $30,000 Rolex watch that he was "pretty sure" Wilson saw.

Around three months later, Taylor saw Wilson at a restaurant, accompanied by the woman who had sold Taylor his condo. A few months after that, on May 31, 2011, Paulino and his assistant were approached by a man when they arrived at Taylor's condo for work. Paulino later identified that man as Wilson. Wilson claimed to live in the complex and wanted to know how much Paulino charged for his cleaning services. After giving Wilson his business card, Paulino and his assistant went to Taylor's condo to begin cleaning. While

14

Paulino was cleaning the shower, a man started "knocking on the shower[,] and he had a gun in his hand[][,] and he told [Paulino] to come out." The gunman led Paulino into the living room, where Paulino saw Wilson, another man, and his cleaning assistant. The gunman "placed the gun" on Paulino's head and directed him to sit on the couch; another of the men grabbed the assistant by the back of her neck.

Paulino saw Wilson and the other two men take a camera from Taylor's condo, but Paulino did not know what else they took. Taylor claimed that the items stolen from his condo included a $2,500 TechnoMarine watch, designer shoes, a designer handbag, and a camera.

Wilson instructed Paulino and his assistant to "remain in the house so they wouldn't do something to [them]." Paulino and his assistant stayed in the condo, but Paulino called Taylor to report what happened, and then Taylor called 911. When police arrived and were interviewing Paulino, he received a phone call, but he was unable to answer the call.

15

Later that day, Paulino checked his phone's call log and saw that the number that called him was listed under the name "Andrew Wilson." Paulino called the number back, and a man Paulino later identified as Wilson answered.[12] Paulino said, "[Y]ou're the person who just robbed the house that I was just in." Wilson hung up the phone; then he called Paulino back from a different phone number and said, "I did not rob your house. I robbed someone else's house. I did nothing to you. I don't want any problems." Wilson also got someone to translate in Spanish that "if [Paulino] went to the police [] [he] would have problems, but [Wilson] didn't want any problems[,] and [Wilson] would kill [Paulino] if [he] spoke to the police and if [Paulino] gave any information." After the conversation, Wilson continued to call Paulino for about a week after the robbery.[13]

Around that time, Taylor's sister received a text message from

_____

[12] Paulino did not explain how he knew the man he spoke with on the phone was Wilson.

[13] The record does not indicate whether Paulino answered those calls from Wilson or, if he did, what Wilson said to Paulino.

Wilson's phone saying that he got a new phone number and to not "call the other number no more." Cell phone records confirmed that Wilson disconnected his phone on May 31, 2011, the same day as the armed robbery.

Paulino said that he called investigators to follow up about the incident and to let investigators know that Wilson was one of the men responsible for the robbery, but no one answered the phone; he left a message; and investigators never returned his call. However, according to Taylor, about a year after the armed robbery, Paulino saw Wilson on the news in relation to Harris's murder investigation and reported the 2011 armed robbery to the police again.

Paulino went to the police station, was shown a photo-array of several individuals, and identified Wilson as one of the men responsible for the armed robbery in Taylor's condo a year earlier. With respect to the 2011 crimes, Wilson was eventually arrested and charged with (among other counts) armed robbery, burglary, and

aggravated assault, which the jury heard at trial.[14]

Before Taylor and Paulino testified, the court gave the jury a limiting instruction, directing the jury to consider the evidence about the 2011 armed robbery only for the purposes of motive and common plan or scheme. The trial court gave the same limiting instruction during the final jury charge.

(c)    Throughout Wilson's trial, the State focused on robbery as a common thread that ran between the 2011 armed robbery in Taylor's condo and the later murder of Harris. During its opening statement, the State remarked that "[t]his [was] a case about good old fashioned American greed." In its closing argument, the State emphasized that "this was a case about greed, pure and simple" and posited that Wilson's "motive is to rob people and to get their things.

---

[14] The entirety of Wilson's charges for the 2011 incident included threatening a witness in an official proceeding, armed robbery, burglary in the first degree, two counts of false imprisonment, two counts of aggravated assault with a deadly weapon, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The charges were still pending at the time of Wilson's murder trial. Wilson was tried on the charges in August 2016 and was found guilty only of threatening a witness in an official proceeding—facts the jury in Wilson's murder trial never heard because those verdicts were not rendered until around eight months after the conclusion of his murder trial.

His motive is to take their things and then to conceal any type of proof or evidence that might link him to it. That's what he did[,] or he tried to do[,] with Mr. Taylor and Paulino. And that's what he did in this case." The State added, "That's what he does. He robs people," "Andrew Wilson is a professional robber. That's what he does," and that is "exactly who he is." Likewise, when referring to Wilson and Hubbard, the State said, "They rob people. They rob people of things that they don't have and that they want, and that's exactly what Mr. Paulino and Mr. Taylor showed. That is their plan, that is their motive, and that is their scheme. That's what they do."

> 2. *The Trial Court Abused its Discretion By Admitting Evidence of the 2011 Armed Robbery Under Rule 404 (b) and the Error Was Not Harmless.*

Wilson contends that the trial court abused its discretion by admitting evidence of the 2011 armed robbery under Rule 404 (b) and that this error was not harmless. As explained more below, we conclude that the trial court did abuse its discretion in admitting evidence of Wilson's 2011 armed robbery to show Wilson's motive and common plan or scheme and that the error was not harmless.

19

(a) Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith."  OCGA § 24-4-404 (b).[15]  That evidence "may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Id. The party seeking to have Rule 404 (b) evidence admitted must show three things:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Heard v. State*, 309 Ga. 76, 84 (844 SE2d 791) (2020) (citation omitted).  For the first prong, evidence is deemed relevant when it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

---

[15] When analyzing OCGA § 24-4-404 (b) we may look for guidance in the decisions of federal appellate courts construing and applying the materially identical Federal Rule of Evidence 404 (b).  See *State v. Almanza*, 304 Ga. 553, 556-557 (820 SE2d 1) (2018).

probable than it would be without the evidence." OCGA § 24-4-401.

"This is a binary question – evidence is either relevant or it is not."

*Heard*, 309 Ga. at 85 (citation omitted). Because we conclude that

the evidence of the 2011 armed robbery was not relevant to the

purposes for which the State propounded the evidence, we do not

address the other two prongs.[16] See OCGA § 24-4-402 ("Evidence

which is not relevant shall not be admissible."). "A trial court's

decision to admit other acts evidence will be overturned only where

there is a clear abuse of discretion." *State v. Jones*, 297 Ga. 156, 159

(773 SE2d 170) (2015) (citation omitted).

(i)  *Motive*

"Motive has been defined as the reason that nudges the will

and prods the mind to indulge the criminal intent." *Bradshaw v.*

---

[16] To admit evidence of a defendant's uncharged crime or "other act," the State must show "that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act." *Heard v. State*, 309 Ga. 76, 84 (844 SE2d 791) (2020) (citation omitted). For the purposes of the Rule 404 (b) analysis, we do not consider Wilson's later acquittal for the 2011 armed robbery, see note 14 above; because the State offered sufficient proof for a jury to conclude by a preponderance of the evidence that Wilson committed the 2011 armed robbery and related crimes, we assume for purposes of this analysis that he did so. See *State v. Atkins*, 304 Ga. 413, 418-419 (819 SE2d 28) (2018).

21

*State*, 296 Ga. 650, 657 (769 SE2d 892) (2015) (citation and punctuation omitted). "Evidence of the defendant's motive is of course relevant, even though it may incidentally place the defendant's character in evidence." *Thompson v. State*, 302 Ga. 533, 540 (807 SE2d 899) (2017). "Overall similarity between the charged crime and the extrinsic offense is not required when the offense is introduced to show motive." *Brooks v. State*, 298 Ga. 722, 726 (783 SE2d 895) (2016) (citation and punctuation omitted). "Even so, to be admitted to prove motive, extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." Id. (citation and punctuation omitted).

Here, the State argued that Wilson's 2011 armed robbery in Taylor's condo was relevant to show Wilson's "motive [ ] to rob people and to get their things. His motive is to take their things and then to conceal any type of proof or evidence that might link him to it." This argument, however, identifies Wilson's "motive to act in far too generic a fashion" to show that the 2011 armed robbery was

22

"logically relevant" to prove Wilson's motive for the crimes related to Harris's murder. See *Kirby v. State*, 304 Ga. 472, 487 (819 SE2d 468) (2018). Indeed, statements supporting the State's characterization of this case as one "about good old fashioned American greed" such as "[t]hat's what [Wilson] does. He robs people," "Andrew Wilson is a professional robber. That's what he does," and that is "exactly who he is." amount to an argument that Wilson is the kind of person who likes to steal from others. That argument—which shows only that Wilson has a general propensity to commit a crime—is the type of propensity argument that Rule 404 (b) is designed to preclude. See *Kirby*, 304 Ga. at 487 (concluding that characterizing the defendant's motive as merely using "violence to obtain money and sex" was "a classic improper propensity argument"). See also *White v. State*, 319 Ga. 367, 398-399 (903 SE2d 891) (2024) (Peterson, PJ, concurring) ("[W]hen a jury is informed that the criminal defendant in front of them did other bad things, jurors (like all human beings) are naturally more inclined to think the defendant did the separate bad thing at issue in the prosecution.

We often call this inference 'propensity,' and label the State's effort to introduce evidence for propensity 'improper' and 'impermissible.'") (citation omitted).  Cf. *Armstrong v. State*, 310 Ga. 598, 602 (852 SE2d 824) (2020) (evidence that the defendant and co-defendants were gang members, along with expert testimony that defiance is seen as disrespect in gang culture, showed motive for the shooting); *Mattei v. State*, 307 Ga. 300, 303-304 (835 SE2d 623) (2019) (evidence of the defendant planning a scheme to run someone over in his employer's truck to collect an insurance payout was relevant to show the defendant's motive for killing the victim for the purpose of obtaining insurance money because it showed "[the defendant's] willingness to harm another person for the specific purpose of collecting insurance money"); *Worthen v. State*, 306 Ga. 600, 605 (832 SE2d 335) (2019) ("[T]he other acts evidence showing gang membership helped to establish a motive for Appellant to encourage [another gang member] to shoot [the victim].").

Because the State failed to prove that the 2011 armed robbery was relevant to prove Wilson's motive, the trial court abused its

discretion in admitting that evidence for that purpose.

(ii) *Common Plan or Scheme*

The phrase "common plan or scheme" is not expressly listed in Rule 404 (b), but it is a phrase often used to describe the permissible purpose of "plan" that is contained in the text of Rule 404 (b).  On this point, we have explained that evidence may be admitted to prove "plan" under Rule 404 (b) if the evidence tends "to prove that [the] defendant employed a 'common scheme' to commit a series of similar crimes."  *Heard*, 309 Ga. at 87-88 (quoting *United States v. LeCompte*, 99 F3d 274, 277 (8th Cir. 1996)).[17]

We have also explained that admitting evidence of "plan" to

---

[17] *Heard* also recognized a second way "other acts" are used to prove plan, explaining that in some cases, evidence admitted under Rule 404 (b) may "show[] the planning of or preparation of the charged offense." 309 Ga. at 87-88.  Here, we acknowledge that just over one year had elapsed between the 2011 armed robbery and Harris's murder.  Although closeness in time between offenses might tend to support the admissibility of an "other act" under Rule 404 (b), the State does not contend that Wilson committed the 2011 armed robbery in the planning of, or preparation for, the crimes against Harris.  See, e.g., *United States v. Oppon*, 863 F2d 141, 147 (1st Cir. 1988) (other-acts evidence that the defendant answered similar citizenship questions on prior job applications was relevant to show plan, and the fact that these acts occurred within a year of the charged offense supported admissibility due to temporal proximity).

25

show a common scheme "blends the purpose of *plan* with the purpose of *identity* – showing that a distinctive plan was used tends to prove that the same person executed both plans." *Heard*, 309 Ga. at 87 (citation omitted) (emphasis in original); *Pritchett v. State*, 314 Ga. 767, 776 (879 SE2d 436) (2022) (same). See also *United States v. O'Connor*, 580 F2d 38, 41 (2d Cir. 1978) (noting that the other-act evidence, which showed "a unique pattern or plan," was admitted "to establish [the defendant's] identity"). And that matters because "[e]vidence offered to prove identity must satisfy a particularly stringent analysis," *Brooks*, 298 Ga. at 725 (citation omitted)—and because of the intersection between "plan" and identity in a Rule 404 (b) analysis, the stringent identity analysis also applies to an analysis of common plan or scheme. See, e.g., *Pritchett*, 314 Ga. at 776; *Heard*, 309 Ga. at 87-88 ("Because this distinctive-plan purpose involves the same considerations as the State's argument that the other-acts evidence showed identity, it succeeds or fails with that argument . . . .").

"When extrinsic evidence is offered to prove identity, the

crucial consideration is the similarity between the charged crime and the prior act. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi." *United States v. Acevedo*, 860 FApp'x 604, 610 (11th Cir. 2021) (citation and punctuation omitted). "The extrinsic act must be a signature crime, and the defendant must have used a modus operandi that is uniquely his. The government must, therefore, show more than simply that the defendant has at other times committed the same commonplace variety of criminal act." Id. (citation and punctuation omitted).

But the State did not "show more than simply that" Wilson "at other times committed the same commonplace variety of criminal act" here. See id. And, as explained below, although the State's explanation of the commonalities between the 2011 armed robbery and the crimes related to Harris's murder features some similarities, those similarities are not sufficient to establish the "modus operandi" or "handiwork of the accused" necessary to

27

establish common plan or scheme under Rule 404 (b).  See *Pritchett*, 314 Ga. at 775.[18]

With respect to the similarities, the State posits that evidence of the 2011 armed robbery showed common plan or scheme because for both sets of crimes, Wilson (1) went to Onyx for the purpose of meeting rich men; (2) "g[o]t to know [them]"; (3) robbed those men with accomplices; (4) stole expensive, unique watches as part of those robberies; and (5) changed his mobile phone number after the crimes.  To assess the similarities between the charged crime in this case and the prior act (the 2011 armed robbery), see *Acevedo*, 860 FApp'x at 610, we look to the evidence presented at trial to determine what the record on appeal shows about whether the

---

[18] The dissenting opinion concluding that the Rule 404 (b) evidence in this case was admissible acknowledges that in applying Rule 404 (b) in this context, we are guided by decisions of federal appellate courts, see footnote 15 above.  But the dissenting opinion fails to apply the "particularly stringent analysis" employed by those federal decisions.  See *Brooks*, 298 Ga. at 725 (quoting *United States v. Phaknikone*, 605 F3d 1099, 1109 (11th Cir. 2010)).  Instead, the dissenting opinion erroneously concludes that the 2011 armed robbery was relevant to prove plan or common scheme under Rule 404 (b) based on a list of similarities—such as stealing small, expensive, easily transportable items from acquaintances—that do not show a signature crime and instead show only that Wilson "has at other times committed the same commonplace variety of criminal act."  *Acevedo*, 860 FApp'x at 610.

alleged similarities are sufficiently unique to demonstrate a common plan or scheme. See *Heard*, 309 Ga. at 88 ("The extrinsic act must be a signature crime, and the defendant must have used a modus operandi that is uniquely his.") (citation and punctuation omitted).

But "the State did not establish that the features of the charged crimes and the [prior] crimes, viewed individually or as a whole, marked those crimes as the unique 'signature' of the same perpetrator." Id. at 90 (citation omitted). First, the State alleged that these were not "random armed robber[ies]," but that Wilson went to Onyx, "approached[] and targeted" "gentlemen who were very well-dressed, driving expensive cars, [and] wearing very unusual, expensive watches." And once Wilson met these men, the State claimed, he would "get to know [them]."

These claims, however, are not supported by the record. To be sure, the evidence the State presented at trial supports the reasonable inference that Wilson visited Onyx on numerous occasions, and Wilson's presence at Onyx is a fact common to the

29

2011 armed robbery and to the State's theory of the crimes related to Harris' murder. With respect to the 2011 armed robbery, however, the record does not show that Wilson used Onyx as a means of "meeting" Taylor for the first time, as the State claims, but rather that he pre-arranged to meet Taylor in the parking lot of Onyx for the purpose of selling Taylor's sister handbags. Moreover, the record does not support the State's assertion that Wilson "g[o]t to know" Taylor as part of a robbery scheme; it shows that before the 2011 armed robbery, Wilson saw Taylor on only two occasions—once to sell him the handbags and once at a restaurant when Wilson was with the woman who sold Taylor his condo.

Likewise, with respect to Harris, there was no evidence that Wilson went to Onyx specifically searching for "rich men" and subsequently met Harris. To the contrary, the record shows that Wilson knew Harris even before he was seen at Onyx with him: Harris's fiancée testified that the two men were "friendly" with one another and that Harris socialized with Wilson. Wilson himself even admitted that he and Harris would "hang out" on occasion.

Moreover, the only connection shown between Wilson, Harris, and Onyx—testimony from Harris's fiancée that she saw Wilson and Harris at Onyx one time, "standing together, just in the same area"— does not show that Wilson used Onyx (as the State contends) to "meet" Harris prior to committing the charged crimes. We therefore see no evidence in the record that, as a part of a robbery scheme, Wilson used Onyx to "approach[] and target[] victims" and "get to know" them, as the State argued in support of admitting the 2011 armed robbery to prove common scheme or plan.

Next, the State argues that the 2011 armed robbery shows a common plan or scheme because the watches stolen from Taylor and Harris were "very unusual fancy watches," and that they showed that Wilson employed a common plan or scheme to obtain those unique and expensive watches from Taylor and Harris. We acknowledge that stealing expensive watches appears to be a common feature between the 2011 armed robbery and the crimes related to Harris's murder. But even assuming the jury concluded by a preponderance of the evidence that Wilson committed the 2011

31

armed robbery in which Taylor's watch was stolen, the State did not present evidence showing that the watch stolen in 2011 was similar enough to the watches stolen from Harris to indicate that there was a "signature crime," and that Wilson "used a modus operandi that [was] uniquely his," see *Pritchett*, 314 Ga. at 775 (citation and punctuation omitted), as opposed to merely stealing expensive items in the course of committing robbery and other crimes.

To that end, each set of crimes involved the theft of various other expensive items, not merely expensive watches. A camera, designer handbags, and designer shoes were also stolen from Taylor in 2011, and a luxury car, designer clothing, and an iPad were also stolen from Harris. Accordingly, we cannot say that the fact of stolen watches—even "very unusual fancy watches"—is indicative of "a modus operandi that [was] uniquely" Wilson's, such that it would support admission under Rule 404 (b), as opposed to a generic feature of perpetrating robberies: stealing expensive items, including watches, from ostensibly wealthy people. See *Pritchett*, 314 Ga. at 775 (citation and punctuation omitted). See also *United*

32

*States v. Thomas*, 321 F3d 627, 635 (7th Cir. 2003) ("Here, the pattern the government considers specific enough to demonstrate *modus operandi* is a defendant in possession of contraband, who, upon seeing police at night, drops or hides that contraband, then flees on foot. If a pattern so generic can establish *modus operandi,* this fairly limited exception to Rule 404 (b) would gut the Rule, rendering it useless as a check on character evidence that would otherwise be inadmissible.") (emphasis in original); *United States v. Lail*, 846 F2d 1299, 1301 (11th Cir. 1988) (concluding that a prior bank robbery was inadmissible under Rule 404 (b) where "at least the first three traits [were] common to many bank robberies," and the fourth similarity related to the location of the crimes had no "great significance"); *United States v. Luna*, 21 F3d 874, 881 (9th Cir. 1994) (in the case of a bank robbery, evidence of two prior bank robberies was inadmissible where the only similarities between the respective offenses were "generic features of a takeover robbery," such as using guns, masks, gloves, bags, loud entry, profanity, and abusing bank employees).

The State also argues that the 2011 armed robbery and the crimes related to Harris's murder are similar because Wilson acted with accomplices for each set of crimes. On this point, Paulino testified that Wilson committed the 2011 armed robbery with two accomplices who were not identified. And in the crimes related to Harris's murder, the State presented evidence that Wilson and Hubbard acted together to commit the crimes. But we cannot say that evidence that a defendant works with accomplices in committing crimes—especially when the evidence presented about two sets of crimes does not involve the same accomplices—is so unique that it "tended to prove that [Wilson] employed a common scheme to commit a series of similar crimes." *Heard*, 309 Ga. at 87. (citation and punctuation omitted).

Finally, the State argues that Wilson changed his phone number after the 2011 armed robbery and after the crimes at issue in this case, which it says establishes Wilson's common robbery scheme. The record shows that after the 2011 armed robbery, Wilson changed his phone number, telling Taylor's sister not to call

the old number anymore. The record also shows that after Harris's death, Wilson changed the phone number for his AT&T phone. This similarity, however, is not unique enough to show a "unique signature of the same perpetrator." See id. at 90 (citation and punctuation omitted). Indeed, a common feature of many of the appeals this Court decides is that evidence is presented that criminals seeking to evade detection will change their phone numbers or destroy their phones. See, e.g., *Sharkey v. State*, 320 Ga. 477, 481 (910 SE2d 216) (2024) (evidence showed that the defendant's cell phone was disconnected after the victim was shot); *Grant v. State*, 319 Ga. 490, 492 (904 SE2d 338) (2024) ("Shortly after the shooting, [the defendant's co-defendant] changed his cell phone number."). Cf. *Heard*, 309 Ga. at 88 (noting that stealing a vehicle and then burning and abandoning that vehicle were not distinctive enough features to satisfy the common-scheme analysis).

It is also important to note that, although there are some common features between the 2011 crimes and the crimes related to

35

Harris's murder, there are also significant differences.[19] See id. at 89 ("The similar (but not unique) features of the charged and uncharged crimes in this case are undermined by the major differences between them."). See also *Lecompte*, 99 F3d at 278 (concluding that the differences between the respective offenses showed an absence of the specific linkage necessary for Rule 404 (b), and thus "such evidence is relevant to 'plan' . . . only insofar as it tends to prove a propensity to commit crimes, which Rule 404[](b) prohibits"). For example, one of the most notable differences was the nature of the violence employed in each crime. In the 2011 armed robbery, the perpetrators placed a gun to Paulino's head and

---

[19] Although it is possible for "a number of common features of lesser uniqueness" to establish "significant probative value when considered together," see *Heard*, 309 Ga. at 88, the State has not shown that here. That is because, as described above, the perceived commonalities were more generic and less specific than the State acknowledges, and also because there are significant dissimilarities between the sets of crimes. See *Lail*, 846 F2d at 1301 (concluding that the "major dissimilarities" between the charged and uncharged bank robberies were more notable than the four similarities, none of which qualified as a distinctive or "signature" characteristics). Cf. *McKinney v. State*, 307 Ga. 129, 136-137 (834 SE2d 741) (2019) (in concluding that the other-act evidence was admissible to establish identity, the court pointed to "several significant similarities" with the charged offenses—most notably that both victims were the appellant's former girlfriends—and found no "major differences" between the incidents).

grabbed his assistant's neck. The crimes related to Harris's murder were, by contrast, significantly more violent: Harris was bound by wiring around his wrist and ankles, had cloth wrapped around his face, was suffocated with plastic, was stuffed in the trunk of his car, and was left in the trunk to burn while his car was set on fire. Moreover, the State presented no evidence that the perpetrators of the 2011 armed robbery engaged in the destruction of physical evidence, whereas there was strong evidence presented that the perpetrators of the crimes related to Harris's death did so: Harris's family smelled bleach throughout the house after his murder, Harris's phones were submerged in bleach, and Harris's vehicle was burned. Finally, the level of familiarity between victim and perpetrator was markedly different between the 2011 armed robbery and the crimes related to Harris's murder. Though evidence was presented that Wilson knew Taylor's sister well enough to pre-arrange and enter into a commercial transaction with her, the evidence showed that Wilson met Taylor twice—once when they met at Onyx to complete the transaction for the handbags and again

37

when Taylor saw Wilson at a restaurant with the woman who sold Taylor his condo; there was no evidence of a personal or professional relationship between them. By contrast, the evidence showed that Harris and Wilson had a preexisting relationship: they were known to be "friendly" and socialize with each other. These differences meaningfully undermine the State's theory that Wilson, as part of his robbery scheme, used Onyx to "approach[] and target[] victims" because they "were very well-dressed, driving expensive cars, [and] wearing very unusual, expensive watches;" that he would "get to know" these men before ultimately, with accomplices, stealing their "very unusual fancy watches" and then changing his phone number. We therefore conclude that the trial court also abused its discretion by admitting evidence of the 2011 armed robbery to show common scheme or plan. See *Heard*, 309 Ga. at 89-90 (concluding that "[t]here was no reason to believe" that the defendant committed the respective offenses considering the "the major differences between them").

(b) Having concluded that the trial court abused its discretion

38

in admitting evidence of the 2011 armed robbery under Rule 404 (b), we must now determine whether the error was harmless, such that Wilson's convictions may stand, or harmful, such that they must be reversed. In evaluating nonconstitutional harmless error, we "examine whether it is highly probable that the error did not contribute to the verdict." *Thompson*, 302 Ga. at 542 (citation and punctuation omitted). "[W]e review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Heard*, 309 Ga. at 90 (citations and punctuation omitted).

Importantly, the State has the burden of showing that a nonconstitutional error was harmless—that is, that it was highly probable the trial court's error did not contribute to the verdict. See *Rivera v. State*, 295 Ga. 380, 382 (761 SE2d 30) (2014). This burden is more stringent than the standard for showing prejudice in the context of plain-error review. See *Shaw v. State*, 292 Ga. 871, 873 (742 SE2d 707) (2013) (for plain-error review, the burden is on the

defendant to make "an affirmative showing that the error probably did not affect the outcome below"). See also *Campbell v. State*, 320 Ga. 333, 366 n.35 (907 SE2d 871) (2024) ("Although we reviewed one of the errors as to [the co-defendants] for only plain error, we need not decide how that could affect our evaluation of the cumulative harm because these claims fail even under the *stricter harmless-error standard* for preserved non-constitutional errors.") (emphasis supplied). Whether or not the State meets its burden is, in part, dependent on how "powerful the wrongly admitted evidence was relevant to the overall mix of evidence." See *Harris v. State*, 321 Ga. 87, 102 (913 SE2d 570) (2025). In other words, "the harmless-error question turns on how much the wrongly admitted evidence likely mattered to the jury's decision to convict." Id. at 101 (citation omitted). If the wrongly admitted evidence was "relatively benign" or cumulative of other evidence, the State may be able to show that the error was harmless. See *Harris v. State*, 314 Ga. 238, 284 (875 SE2d 659) (2022). See also *Jivens v. State*, 317 Ga. 859, 863 (896 SE2d 516) (2023) (explaining that the allegedly improper admission

of photographs of the defendant with firearms was harmless, partly because "any prejudicial effect these photographs may have had was minimized by properly admitted evidence that [the appellant], in fact, had access to guns"). "By contrast, if the wrongly admitted evidence was weighty—perhaps because it carried a high risk of prejudice or was important to proving an element of the State's case—only the most compelling admitted evidence of guilt might prevent reversal." *Harris*, 321 Ga. at 102 (citation and punctuation omitted). See also *Strong v. State*, 309 Ga. 295, 316 (845 SE2d 653) (2020) ("[A]lthough the jury could have found Appellant guilty if it believed the State's witnesses and disbelieved Appellant, we cannot say that it is highly probable that the trial court's erroneous admission of the voluminous evidence that Appellant had previously committed multiple serious violent acts did not contribute to the guilty verdicts that the jury returned."). Critically, other-acts evidence may be deemed not harmless where it "affects the jury's perception of the defendant and its assessment of his credibility." *Harris*, 321 Ga. at 102.

41

Here, we conclude that the trial court's error was not harmless: the wrongly-admitted Rule 404 (b) evidence was highly prejudicial and played a significant role in the State's case and its portrayal of Wilson to the jury, and the properly admitted evidence against Wilson was not so overwhelming that we can say it was highly probable that the wrongly-admitted Rule 404 (b) evidence did not contribute to the verdicts.

The State's case against Wilson was entirely circumstantial. As we recounted above in Division 1, that circumstantial evidence included phone records showing that Wilson's and Hubbard's phones communicated on the day of the murder about 50 times, and that their phones were in the same area as Harris's phones when Harris was in Cobb County; that Wilson's Metro PCS phone then matched the movement of Harris's car when it arrived at Harris's house and left Harris's house; and that Wilson's and Hubbard's phones were near the area where Harris's body was found around the time the fire started. Additionally, shortly before two witnesses saw smoke coming from Harris's vehicle, they saw a white Corvette, which

matched the one owned by Hubbard, driving in the direction of the location where Harris's car and body were found. This was also around the same time Wilson's and Hubbard's phones were in that area. Finally, a photo stored on Hubbard's phone showed him wearing a watch that matched the description of the watch stolen from Harris, and the day that photo was taken, both Wilson and Hubbard were in Detroit—which was the location of a pawn store at which Harris, Wilson, and Hubbard were customers.

Though this circumstantial evidence is admittedly strong—and is sufficient to affirm Wilson's convictions (except for theft by receiving, as explained more below in Division 3) as a matter of constitutional due process—it was not so overwhelming that it rendered the error in admitting the Rule 404 (b) evidence harmless. See *Thompson*, 302 Ga. at 542 (in evaluating nonconstitutional harmless error, we "examine whether it is highly probable that the error did not contribute to the verdict").

Indeed, the evidence presented in this case is different from, and of less probative value than, the evidence presented in other

cases in which we have concluded that erroneously-admitted Rule 404 (b) evidence was harmless. Unlike in those cases, where other direct and overwhelming evidence—such as DNA evidence, eyewitness testimony, surveillance footage, or a defendant's incriminating admissions—meant that it was not highly probable that the erroneously-admitted Rule 404 (b) evidence contributed to the verdict, no evidence of that kind was presented here, and the evidence of Wilson's guilt was not overwhelming. Compare, e.g., *Rivera v. State*, 317 Ga. 398, 408-411 (893 SE2d 696) (2023) (erroneous admission of Rule 404 (b) evidence was deemed harmless in a murder prosecution that involved an alleged sexual assault, given the overwhelming evidence of guilt—including DNA evidence and witness testimony placing a car resembling defendant's distinctive car at the nightclub where the witness had dropped the victim off on the night she was last seen alive); *Rooks v. State*, 317 Ga. 743, 762 (893 SE2d 899) (2023) (893 SE2d 899) (2023) (erroneous admission of Rule 404 (b) evidence was deemed harmless in light of surveillance footage showing the defendant with accomplices before

44

and after the murder, cell-phone location data placing him near the crime scene, the presence of defendant's DNA at the crime scene, and defendant's own admissions to the crime); *Randolph v. State*, 317 Ga. 146, 154 (891 SE2d 818) (2023) (holding that admission of a prior home burglary under Rule 404 (b) was harmless in light of the strong evidence of the defendant's guilt, including eyewitness testimony that he was the shooter and the presence of fingerprints matching the defendant's at the crime scene); *Priester v. State*, 316 Ga. 133, 137-138 (886 SE2d 805) (2023) (concluding that the admission of a prior armed robbery under Rule 404 (b) was harmless where the other evidence presented at trial included surveillance video of the defendant committing the crime and testimony from witnesses who saw the defendant in possession of the vehicle seen on surveillance video). Nor was the evidence presented against Wilson cumulative of other properly-admitted evidence, as we have concluded in other cases where erroneously-admitted Rule 404 (b) evidence was deemed harmless. Compare, e.g., *Kirby*, 304 Ga. at 487 (erroneous admission of Rule 404 (b) evidence was deemed

45

harmless because the evidence was cumulative of other properly-admitted evidence); *Hood v. State*, 299 Ga. 95, 105-106 (786 SE2d 648) (2016) (wrongly-admitted Rule 404 (b) evidence of defendant's participation in drug deals was harmless where evidence that the defendant had distributed drugs to people other than the murder victim was properly admitted).

We acknowledge that evidence of cell-phone location data was presented at trial that placed Wilson's phone near Harris's house shortly before the house was found ransacked, and later near the locations where Harris's car and body were discovered, and that Wilson and Hubbard exchanged numerous phone calls throughout the day on which Harris was murdered. However, that data could only show the general area of the cell phone locations, see *Thompson,* 302 Ga. at 542 (concluding that that the improper admission of Rule 404 (b) evidence was not harmless, even though there was evidence that the defendant's phone was "near the crime scene at about the time the murders took place"), and no witnesses testified to seeing Wilson and Hubbard together on the days in

which the crimes against Harris were committed, or to seeing Wilson near Harris's house or near Harris around the time of the crimes, or to seeing Wilson near where Harris's burning car was discovered test, see *Heard*, 309 Ga. at 93 (concluding that the erroneous admission of Rule 404 (b) evidence was not harmless despite evidence that the defendant and his accomplice exchanged 28 calls in the hours before the murder—and 10 more shortly before it—during which time both of their phones were near the crime scene). And this Court has before concluded that erroneous admission of Rule 404 (b) evidence in a murder prosecution was not harmless—despite evidence of a defendant's multiple phone calls with his accomplice on the day of the murder, in part, because the only eyewitness connecting the defendant to the crime scene never saw the defendant "come, go, or interact with the direct perpetrators of the crimes." See *Heard*, 309 Ga. at 92.

In the face of this less-than-overwhelming, circumstantial evidence, the introduction of evidence that Wilson committed an armed robbery that involved holding victims at gunpoint and

47

threatening them to keep quiet slightly over a year before Harris was robbed and murdered was undoubtedly prejudicial. See *Strong*, 309 Ga. at 316 (concluding that the violent nature of the erroneously admitted prior act contributed to its prejudicial value). First, although the jury heard that Wilson had been charged with some crimes related to the 2011 armed robbery, the State did not present evidence that Wilson already had been tried or convicted of any crimes related to it. This "increased the risk that the jury would want to punish" Wilson "for his past conduct rather than only for the charged crimes," see *Jackson v. State*, 306 Ga. 69, 79-80 (829 SE2d 142) (2019), especially because the State argued in closing that Paulino's interest in testifying in this case was "to seek justice for his own case" related to the 2011 armed robbery.

Second, evidence of the 2011 armed robbery was a significant focus of the State's case, as outlined above in Division 1, and in particular, because of its heavy reliance on the fact that watches were stolen in both the prior act and in this case. From the outset of the State's prosecution of Wilson, it emphasized the importance

of watches. The evidence presented at trial included testimony from the general manager of the watch store where Harris was a customer; among other things, he testified about the value of Harris's watches. The State also elicited testimony from Harris's family members, fiancée, and girlfriends about his affinity for and ownership of expensive watches and asked Taylor what type of watch he was wearing when he was introduced to Wilson, as well as the value of that watch. All of this appeared to be in service of the State's effort to connect the 2011 armed robbery to Harris's murder.

The watches were a focal point the State used to construct and advance the following transitive relationship: Wilson stole watches from Taylor; watches were stolen from Harris; and so, Wilson must have murdered Harris and stolen his watches. See *Harris*, 321 Ga. at 102 ("[I]f the wrongly admitted evidence . . . was important to proving an element of the State's case—only the most compelling properly admitted evidence of guilt might prevent reversal.") (citation and punctuation omitted). Moreover, the State's unrelenting focus on the 2011 armed robbery pervaded its case: the

49

State emphasized the Rule 404 (b) evidence throughout trial to shape its narrative of Wilson as the kind of person who "rob[s] people of things that they don't have and that they want, and that's exactly what Mr. Paulino and Mr. Taylor showed" and to show that Wilson's "motive is to rob people and to get their things. . . . That's what he did[,] or he tried to do[,] with Mr. Taylor and Paulino. And that's what he did in this case." Compare *Baker v. State*, 318 Ga. 431, 451 n.20 (899 SE2d 139) (2024) ("Although the jury was authorized to disbelieve [the defendant's] account, we would expect that the prosecutor's repeated use of the video to emphasize [the defendant's] alleged propensity for gun violence would have significantly undermined his credibility with the jurors. In other words, the prosecutor's use of the video to emphatically cast [the defendant] as a violent gunman before the jury had an opportunity to listen to [the defendant's] own account and assess his credibility made it more likely that the jury would disbelieve [the defendant's] testimony not because it was unworthy of belief, but because he had been portrayed as the sort of person who would commit a crime like the

50

one with which he was charged.") with *Bowman v. State*, 319 Ga. 573, 584-585 (905 SE2d 605) (2024) (admission of Rule 404 (b) evidence that the defendant used violence against his ex-wife was deemed harmless because the "marginal harm" of the other-acts evidence "was unlikely to have significantly altered the jury's perception of [the defendant], given that the jury heard substantial other evidence, unchallenged on appeal, of [the defendant's] violence and jealousy against [the victim]"). In part because of the significant weight and importance the State placed on watches and the 2011 armed robbery in proving its murder case against Wilson, and the State's repetition of improper propensity arguments, the admission of the Rule 404 (b) evidence was prejudicial.

And this prejudicial effect was exacerbated by the State's characterization of Wilson in closing arguments, labeling him a "professional robber" and, regarding the respective offenses, emphasizing that "that's what he does." This type of framing underscores the State's use of the other-acts evidence for propensity, rather than for a use permissible under Rule 404 (b), because it

"added sharper, more damning, and more plainly criminal details to the State's portrayal of [Wilson] as a man of despicable character who deserved punishment." *Harris*, 314 Ga. at 284. See also *Baker*, 318 Ga. at 448-449 (in analyzing whether erroneous admission of evidence under OCGA § 24-4-403 ("Rule 403") was harmful, concluding that admitting evidence of the defendant's rap music video was highly prejudicial where the State, during its closing argument, emphasized that the defendant and "other rap artists promoted gun violence, because that's all they know, a pointed argument that reinforced to the jury [the defendant's] alleged violent character") (citation and punctuation omitted).[20] Moreover, the State has the burden of showing that the erroneously-admitted Rule 404 (b) evidence was not harmful, and it has not done so here.

---

[20] We recognize that reasonable jurors may have viewed the strength of the circumstantial evidence described above differently and may have drawn different inferences and conclusions from it as a result. But given the outsized impact the erroneously-admitted Rule 404 (b) watch evidence had at trial, the fact that reasonable jurors may have viewed the strength of the evidence of Wilson's guilt differently undermines, rather than supports, a conclusion that the evidence was so overwhelming that the jury would have convicted Wilson notwithstanding the admission of the 2011 armed robbery.

*

Given the State's focus on the 2011 armed robbery, its focus on the common link of expensive watches being stolen (even though other expensive items were stolen, too), its characterization of Wilson as a "professional robber," and the repetition of these characterizations at key points during Wilson's trial, we cannot say that it is "highly probable" that the erroneously admitted evidence did not contribute to the jury's verdict. See, e.g., *Harris*, 314 Ga. at 288-289 (reversing the defendant's convictions due to the improper admission of evidence under Rule 403, which was not harmless, because the evidence was highly prejudicial and the proof of the defendant's guilt "was not 'overwhelming,' 'compelling,' or even strong"). And the State has not carried its burden to show otherwise. Because the trial court abused its discretion by admitting evidence of Wilson's 2011 armed robbery and that error was not harmless, we reverse Wilson's convictions.

3. Wilson does not contend that the evidence was insufficient as a matter of constitutional due process to support the jury's guilty

53

verdicts. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979). But because we have reversed Wilson's convictions, we address the sufficiency of the evidence to determine whether Wilson may be re-tried on the counts for which he was indicted. See *Baker*, 318 Ga. at 452 n.21 (reversing the defendant's conviction but concluding that he could be re-tried because the evidence "was constitutionally sufficient to sustain the jury's guilty verdicts") (citation omitted); *Harris*, 314 Ga. at 289 (same). See also *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020) (explaining that we may exercise our discretion to consider the sufficiency of the evidence sua sponte where the circumstances justify such review).

When evaluating whether evidence is constitutionally sufficient to support a jury's guilty verdicts, "we view all of the evidence presented at trial in the light most favorable to the verdict[s] and ask whether any rational trier of fact could have found the [appellant] guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304 Ga. 594, 598 (820 SE2d

696) (2018) (citing *Jackson*, 443 U.S. at 318-319). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." *Harris v. State*, 313 Ga. 225, 229 (869 SE2d 461) (2022) (citation and punctuation omitted).

(a) As to Wilson's conviction for theft by receiving stolen property, we conclude that the evidence was not constitutionally sufficient to support his conviction. Here, the indictment alleged that Wilson "did unlawfully receive and retain . . . two watches, of a value in excess of $25,000 and property of Gregory Harris, said property having been stolen from the said Gregory Harris and [Wilson] should have known said property was stolen; said property not having been received and retained by [Wilson] with intent to restore the same to its owner." "A person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent

55

to restore it to the owner. 'Receiving' means acquiring possession or control or lending on the security of the property." OCGA § 16-8-7 (a).

A review of the record shows that the only evidence presented at trial that could have supported the allegation that Wilson committed theft by receiving was that Wilson's phone was near Harris's house prior to Harris's family discovering that his watches had been stolen from his home and that Wilson and Hubbard were in Detroit on the same day that Hubbard pawned a watch and took a photo of a watch that appeared to be similar to one owned by Harris. Based on this scant evidence, however, no rational juror could have concluded beyond a reasonable doubt that the watch Hubbard had a picture of was, in fact, Harris's watch, and that thus Wilson "receiv[ed]," "dispos[ed] of," or "retain[ed]" Harris's watch (and therefore committed theft by receiving). See OCGA § 16-8-7 (a); *Jackson*, 443 U.S. at 318-319. Cf. *Pender v. State*, 311 Ga. 98, 102-105 (856 SE2d 302) (2021) (evidence was sufficient to support theft by receiving stolen property conviction where the State

presented evidence that the defendant was in possession of the truck that had been stolen by his accomplice). This is especially so considering evidence was presented at trial that Wilson and Hubbard were previous customers of the pawn store and had bought and sold multiple watches in the past. We therefore conclude that the evidence presented at trial was not constitutionally sufficient to support his conviction for theft by receiving; we reverse that count; and Wilson may not be retried on it. See *Jefferson v. State*, 310 Ga. 725, 726-727 (854 SE2d 528) (2021).

(b) As to the remaining guilty verdicts for murder, kidnapping, and arson, we have reviewed the record and conclude that the evidence presented at trial and recounted in relevant part above was constitutionally sufficient to support these convictions. See *Beamon v. State*, 314 Ga. 798, 802 (879 SE2d 457) (2022) (concluding that circumstantial evidence of guilt was constitutionally sufficient to support convictions for malice murder, kidnapping, and other crimes where evidence showed, in part, that the defendant's phone was near the victim's apartment on the day of the murder); *Heard,* 309

Ga. at 79-83 (concluding that evidence was constitutionally sufficient to support the defendant's convictions where phone records showed that the defendant and his accomplice communicated a number of times before the murder and the defendant's phone was near the crime scene); *Williams v. State*, 300 Ga. 161, 164 (794 SE2d 127) (2016) ("Most damning are the cell phone records, reflecting 25 phone calls between [the co-defendant's] cell phones on the day of the crimes, most of which occurred in the hours leading up to the crimes and which were transmitted from cell towers in close proximity to the crime scene."). See also *Floyd v. State*, 318 Ga. 312, 317-318 (898 SE2d 431) (2024) (citing *Jackson*, 443 U.S. at 319). As a result, Wilson may be re-tried on those counts.

4. Because we have reversed Wilson's convictions and he may be retried on some counts, we address a claim that seems likely to recur if the State elects to retry him: that the trial court erred by denying his motion to suppress evidence of his cell phone records and cell phone location data. See *McIver v. State*, 314 Ga. 109, 144

(875 SE2d 810) (2022) ("Because we are reversing some of [the defendant's] convictions, we next consider those evidentiary issues that are likely to recur if the State elects to retry [the defendant]."); *Moon v. State*, 312 Ga. 31, 50 (860 SE2d 519) (2021). We disagree that the trial court erred by denying Wilson's motion to suppress this evidence.

In 2012, the lead investigator in Harris's murder case filed motions seeking court orders requiring AT&T and Metro PCS to disclose Wilson's phone records, including cell phone location data. The trial court issued the orders under the federal Stored Communications Act ("SCA"). See 18 USC § 2703 (c) (1) (B) & (d).[21]

---

[21] At the time Wilson's cell phone records and cell-phone location data were obtained by court order in 2012, 18 USC § 2703 (c) (1) provided that "[a] governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)," including, in subparagraph (c) (1) (B), when the governmental entity "obtains a court order for such disclosure under subsection (d) of this section." 18 USC § 2703 (d) then said, in relevant part:

A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought[] are

See also OCGA § 16-11-66.1 (a) (permitting a prosecutor to require the disclosure of cell phone records "to the extent and under the procedures and conditions provided for by the laws of the United States").

Prior to trial, Wilson filed a motion to suppress his phone records, "including, but not limited to call details, text messages details, text message content, subscriber information, etc." At a hearing on the motion to suppress, Wilson's counsel argued that text messages on Wilson's phones were inadmissible because investigators failed to obtain a search warrant, but conceded that cell phone records and other information derived from those records, such as subscriber information, call details, and incoming and outgoing calls, were admissible and could be obtained by court order. The trial court then suppressed the content of text messages on Wilson's phones but admitted his cell phone records. At trial, Wilson did not object to the admission of his phone records and

relevant and material to an ongoing criminal investigation. In the case of a State governmental authority, such a court order shall not issue if prohibited by the law of such State.

60

accompanying cell-phone location data.

On appeal, Wilson argues that the State's failure to obtain a search warrant for his phone records and cell-phone location data violated his right against illegal searches and seizures under the Fourth Amendment to the United States Constitution. Relying on *Carpenter v. United States*, 585 U.S. 296, 316 (138 SCt 2206, 201 LE2d 507) (2018), Wilson contends that he had a reasonable expectation of privacy in his phone records and location data and the State was thus required to secure a search warrant supported by probable cause (not merely a court order) to obtain his cell phone records and accompanying location data. See 585 U.S. at 316 (holding that the government must generally obtain a search warrant supported by probable cause before acquiring historical cell-phone location data from wireless carriers). Accordingly, Wilson argues that the trial court should have suppressed all evidence related to his phone records and not just his text messages.

Without deciding whether Wilson preserved this claim for ordinary appellate review, we conclude that the trial court did not

err in admitting his cell phone records and accompanying location data. "When reviewing a trial court's ruling on a motion to suppress, we review its legal conclusions de novo and independently apply the law to the undisputed facts." *Gates v. State*, 317 Ga. 889, 889 (896 SE2d 536) (2023) (citation omitted).

At the time Wilson's cell phone records and cell-phone location data were obtained by court order in 2012, the SCA authorized the State to obtain cell phone records by court order if that State provided "specific and articulable facts showing that there are reasonable grounds to believe" that those records "are relevant and material to an ongoing criminal investigation." 18 USC § 2703 (d). Although *Carpenter* later concluded that portions of the SCA were unconstitutional and held that "the Government must generally obtain a warrant supported by probable cause before acquiring," see 585 U.S. at 316, a person's cell phone records, *Carpenter* had not yet been decided at the time Wilson's phone records were obtained by court order; at that time, the SCA purported to permit the State to obtain the evidence by court order instead of through a search

62

warrant; and Wilson does not contend that the State failed to meet the requisite showing under the SCA in 2012. Accordingly, the good-faith exception to the exclusionary rule applied to the State's actions because at the time, investigators reasonably relied in good faith on a statute that authorized them to obtain cell phone records and cell-phone location data by court order. See *Outlaw v. State*, 311 Ga. 396, 400 (858 SE2d 63) (2021) ("[T]he good-faith exception for objectively reasonable reliance on a statute that appeared legitimately to allow a warrantless search applies with equal force here, because 18 USC § 2703 (c) (1) (B) and (d) authorized the State's investigative conduct at the time.") (citation omitted).

Moreover, when the State procured Wilson's phone records in 2012, binding appellate precedent in Georgia held that a person "generally had no reasonable expectation of privacy in their cell phone records and therefore lacked standing to raise a Fourth Amendment challenge to the disclosure of the records." Id. (citing *Lofton v. State*, 310 Ga. 770, 784 (854 SE2d 690) (2021)). See also *Ross v. State*, 296 Ga. 636, 639 (769 SE2d 43) (2015), overruled by

63

*Carpenter*, 585 U.S. at 310-313; *Registe v. State*, 292 Ga. 154, 156 (734 SE2d 19) (2012), overruled by *Carpenter*, 585 U.S. at 310-313. Thus, because the SCA and binding appellate precedent authorized the State's conduct at the time Wilson's phone records were obtained by court order in 2012, those records were not subject to exclusion based on the Fourth Amendment. See *Lofton*, 310 Ga. at 784 ("Because, at the time of [the defendant's] trial, a federal statute . . . and binding appellate precedent . . . authorized the investigatory conduct at issue, reversing the trial court's decision in this case would have little, if any, additional benefit in deterring future violations of the privacy interests recognized in *Carpenter*. We therefore affirm the trial court's ruling.") (citation and punctuation omitted). For all of these reasons, the trial court did not err by admitting Wilson's cell phone records and accompanying location data.

\*

For the reasons set out above, the trial court abused its discretion by admitting evidence of Wilson's 2011 armed robbery

64

and we conclude that error was not harmless. Wilson's convictions must therefore be reversed. The evidence presented at trial was not constitutionally sufficient to support Wilson's guilty verdict for theft by receiving stolen property, so he may not be re-tried on that count. However, the evidence was sufficient as a matter of constitutional due process as to the murder, kidnapping, and arson counts, so the State may re-try him on those counts if it chooses to do so. See *Heard*, 309 Ga. at 83 n.10. Finally, the trial court did not err by admitting Wilson's cell phone records and cell phone location data.

*Judgment reversed. Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur. Peterson, CJ, and LaGrua, J, dissent in part.*

PETERSON, Chief Justice, dissenting in part.

Regardless of whether the trial court abused its discretion by admitting evidence of the 2011 armed robbery under OCGA § 24-8-404 (b) ("Rule 404 (b)"), any error was harmless. In my view, the evidence of Wilson's guilt, although circumstantial, was very strong and the jury was highly likely to convict even without the Rule 404 (b) evidence. As a result, I would affirm Wilson's convictions on all counts (except the count of theft by receiving stolen property, on which I agree with the majority's thorough analysis), and thus I respectfully dissent in part.

"A trial court's evidentiary error warrants reversal only if it was *harmful*." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023) (emphasis added). And "[t]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (punctuation and citation omitted). Although the evidence of Wilson's guilt was circumstantial, it was nonetheless compelling. Most notably, the cell phone location data from Wilson's, Hubbard's, and Harris's phones

66

showed that Wilson and Hubbard were with Harris mere hours before his ransacked house was discovered and then near the location where Harris's body and burned-out car were found. Wilson's and Hubbard's phones were also in almost constant communication in the hours leading up to and following the crime. We have previously characterized this kind of evidence as "damning." *Williams v. State*, 300 Ga. 161, 164 (1) (794 SE2d 127) (2016) (cell phone records between co-defendants "on the day of the crimes, most of which occurred in the hours leading up to the crimes and which were transmitted from cell towers in close proximity to the crime scene" was strong evidence of guilt); see also *Willis v. State*, 315 Ga. 19, 25 (2) (880 SE2d 158) (2022) (defendant's cell phone records "offered strong support" that he was one of the perpetrators when "[t]he phone records showed not only that [the defendant] was near the location of both crimes at the time they were committed, but also that he moved around the city with his co-defendants after the crimes, and that he was in communication with them throughout the day").

67

The State also presented evidence that, in the days following the murder, Wilson and Hubbard both left Atlanta for Detroit, see *Gray v. State*, 319 Ga. 72, 78 (2) (901 SE2d 556) (2024) (noting that flight is "admissible as evidence of consciousness of guilt, and thus of guilt itself") (punctuation and citation omitted), Hubbard took a photo wearing a watch that matched the description of one of the stolen watches, and Hubbard had money to pay the Detroit pawn shop and pawned a watch there. And during the week following the murder, Wilson wiped his phone and then disconnected it. See *Martin v. State*, 306 Ga. 538, 541 (1) (832 SE2d 402) (2019) (efforts to destroy or conceal evidence indicative of consciousness of guilt). Finally, Wilson refused to answer whether he had ever been in Harris's house.

In reversing, the majority relies heavily on our decision in *Heard v. State*, 309 Ga. 76 (844 SE2d 791) (2020). But the location data in *Heard* was much less damning. It involved two locations: one that also happened to be where the defendant lived, such that the presence of his phone was not unusual, and the other that was

68

probative only because it linked the defendant to a codefendant as to whom there was little evidence that he was involved in the crimes. See id. at 93. *Heard* was quite unlike this case.

Considered together, any reasonable jury would have returned a guilty verdict in the light of all of this evidence. See *Parks v. State*, 300 Ga. 303, 308 (1) (794 SE2d 623) (2016) ("where evidence of guilt is overwhelming, erroneous admission of Rule 404 (b) evidence is harmless" (punctuation and citation omitted)); see also *Jackson v. State*, 306 Ga. 69, 81 (2) (c) (829 SE2d 142) (2019) (holding other acts evidence harmless where "there was compelling circumstantial evidence of Appellant's involvement in the shooting"). Accordingly, even if the Rule 404 (b) evidence was inadmissible, and even with how prejudicially the State chose to use it, the jury's verdict would not have been different.

In short, I think it is highly probable that the improper Rule 404 (b) evidence did not contribute to the verdict. Accordingly, I respectfully dissent in part.

LAGRUA, Justice, dissenting in part.

More than a decade ago, the General Assembly "enacted a new Evidence Code, of which [OCGA § 24-4-404 (b) ("Rule 404 (b)")] is a part." *Olds v. State*, 299 Ga. 65, 68 (2) (786 SE2d 633) (2016). Because "[m]any provisions of [our] new Evidence Code were borrowed from the Federal Rules of Evidence," our Court looks to "decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit," in considering "the meaning of these provisions." Id. (citation omitted). "Rule 404 (b) is one such provision, and so, when we have considered the meaning of Rule 404 (b), we consistently have looked for guidance in the decisions of the federal appellate courts construing and applying Federal Rule of Evidence 404 (b)." Id. (citations omitted). See also *State v. Almanza*, 304 Ga. 553, 556 (2) (820 SE2d 1) (2018) ("[T]he rule is simple: if a rule in the new Evidence Code is materially identical to a Federal Rule of Evidence, we look to federal case law.") (citation omitted).

When our federal counterparts have construed and applied Federal Rule of Evidence 404 (b), they have concluded that, while "[e]vidence of uncharged or past crimes is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," *United States v. Cenephat*, 115 F4th 1359, 1365 (II) (A) (11th Cir. 2024), "such evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Nerey*, 877 F3d 956, 974 (VI) (11th Cir. 2017) (citations and punctuation omitted). And, in this respect, "Rule 404 (b) is a rule of *inclusion*," id. (emphasis supplied), and "relevant prior bad acts evidence like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." *United States v. Abreu-Jimenez*, 535 F.App'x 860, 867 (II) (A) (11th Cir. 2013) (citation and punctuation omitted).

This Court has also said that Rule 404 (b) "is, on its face, an evidentiary rule of *inclusion* which contains a *non-exhaustive* list of

71

purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence." *Prichett v. State*, 314 Ga. 767, 774 (2) (a) (879 SE2d 436) (2022) (citation and punctuation omitted; emphasis supplied).  See also OCGA § 24-4-404 (b) (evidence may "be admissible for other purposes, including, *but not limited to*, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident") (emphasis supplied). However, of late, this Court appears to have forgotten, or has simply decided to discredit, the inclusive nature of Rule 404 (b) and our standard of review when examining a trial court's ruling on whether to admit 404 (b) evidence at trial. See *Harris v. State*, 321 Ga. 87, 106 (913 SE2d 570) (2025) (LaGrua, J, dissenting) (noting that "[t]he majority's opinion departs from this long-established precedent" that "Rule 404 (b) is an evidentiary rule of inclusion" and "continues the Court's trend of moving away from this principle of inclusion"). See also id. at 95 (2) (a) ("We review [a Rule 404 (b)] ruling for an abuse of discretion.").

While I understand there may be some disagreement about the

72

admission of other-acts evidence against a defendant at trial, the law allows that, with certain exceptions, other-act evidence can be admitted when that evidence is both relevant and probative to matters other than the defendant's criminal disposition. And, unless or until the General Assembly modifies Rule 404 (b), I will adhere to the legal standard provided by this rule, as well as the deference we must give to the discretion of trial courts in determining whether other-acts evidence is admissible at trial.[22] Accordingly, I respectfully dissent.

1. As an initial matter, I recognize that, even when evidence is being offered for a *proper* purpose under Rule 404 (b), it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. And, to that

---

[22] See, e.g., *Harris*, 321 Ga. at 95 (2) (a); *Nerey*, 877 F3d at 977 (VI); *United States v. Eckhardt*, 466 F3d 938, 946 (11th Cir. 2006); *United States v. Matthews*, 431 F3d 1296, 1310-1311 (11th Cir. 2005); *United States v. Henderson*, 409 F3d 1293, 1297 (11th Cir. 2005).

end, we apply "a three-part test to determine if the evidence of a defendant's other acts is admissible," requiring "the proponent of the evidence" to show

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Prichett*, 314 Ga. at 774 (2) (a) (citation omitted). See also *United States v. LeCompte*, 99 F3d 274, 277 (8th Cir. 1996) ("Under Rule 404 (b), testimony concerning other bad acts is admissible if it is relevant to a material issue, established by a preponderance of the evidence, more probative than prejudicial, and similar in kind and close in time.") (citation and punctuation omitted). See also *Nerey*, 877 F3d at 974 (VI).

Notably, we have said that "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly," *Baker v. State*, 318 Ga. 431, 442 (2) (a) (899 SE2d 139) (2024) (citation and punctuation omitted), and so, "in reviewing

the admission of evidence under Rule 403, we look at the evidence in a light *most favorable to its admission*, maximizing its probative value and minimizing its undue prejudicial impact." *Wilson v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021) (citation and punctuation omitted; emphasis supplied).

2. In this case, the majority opinion concludes that the other-acts evidence presented in this case "was not relevant to the purposes for which the State propounded the evidence," and thus, the trial court abused its direction by admitting this evidence at trial. I disagree.

OCGA § 24-4-401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We have described the standard for relevant evidence as "a liberal one" and held that "such evidence is generally admissible even if it has only slight probative value." *Siders v. State*, 320 Ga. 367, 374 (3) (a) (907 SE2d 645) (2024). See also *Booth v. State*, 301 Ga. 678, 683 (3) (804 SE2d

104) (2017) ("The test for relevance under Rule 401 is generally a liberal one[.]").

At trial, the State was permitted to introduce evidence of the 2011 armed robbery to prove Wilson's motive and/or common plan or scheme in committing the underlying crimes at issue here. And, certainly, evidence of the 2011 armed robbery was relevant to the issue of common plan and scheme.

> In prior cases addressing the proper use of Rule 404 (b) evidence to show plan or preparation in connection with a defendant's participation in the crimes charged, this Court has applied federal case law to recognize two general categories of "plan" evidence under Rule 404 (b): the other-acts evidence shows the planning of or preparation for the charged offense, or it tends to prove that the defendant employed a "common scheme" to commit a series of similar crimes.

*Pritchett*, 314 Ga. at 775 (2) (b) (citations and punctuation omitted). This case fits squarely in the latter category.

Within this category, "we have explained that this approach blends the purpose of *plan* with the purpose of *identity* – showing that a distinctive plan was used tends to prove that the same person executed both plans." *Pritchett*, 314 Ga. at 775 (2) (b) (citation and

punctuation omitted; emphasis in original). See also *LeCompte*, 99 F3d at 277 (noting that, "[i]n many cases," other-acts evidence is "relevant to proving plan, preparation, and modus operandi . . . because it tended to prove that [the] defendant employed a common scheme to commit a series of similar crimes") (citations and punctuation omitted). This category might also "involve[] similar act testimony constituting a continuing scheme or conspiracy." *Morrell v. State*, 313 Ga. 247, 257 (2) (a) (869 SE2d 447) (2022) (quoting *United States v. O'Connor*, 580 F2d 38, 41-42 (2d Cir. 1978); punctuation omitted).

The majority opinion concludes that the trial court abused its discretion by admitting evidence of the 2011 armed robbery to show common plan or scheme because the State merely showed that Wilson "at other times committed the same commonplace variety of criminal act" at issue here and because, while there were "some similarities" between the 2011 armed robbery and the crimes against Harris, "those similarities are not sufficient to establish the 'modus operandi' or 'handiwork of the accused' necessary to

establish common plan or scheme under Rule 404 (b)." *Prichett*, 314 Ga. at 775 (2) (b). To the contrary, I see no abuse of discretion in the trial court's admission of the 2011 armed robbery as "a common scheme to commit a series of similar crimes." *Morrell*, 313 Ga. at 257 (2) (a) (citation and punctuation omitted).

In the 2011 armed robbery involving Taylor and the charged offenses against Harris, which occurred just over a year apart, Wilson followed a pattern. He would identify a certain type of victim—someone with whom he shared a common link[23] and who seemingly had considerable wealth with a taste for expensive items that could easily be transported and sold for value. Wilson would gain access to and became familiar with these victims through casual interactions at a strip club, a night club, a restaurant, and/or a party, and he would then find a way to engage them directly or through a close acquaintance—a pattern he followed with both Taylor and Harris. And, after observing that these men had items

---

[23] Wilson and Harris were both from Detroit and conducted business at the same Detroit pawnshop. Taylor's sister—a realtor—knew Wilson because her boss, who sold Taylor his condominium, "used to mess around" with Wilson.

of significant value—expensive watches and luxury automobiles—and that they might not have the scruples of other wealthy individuals[24]—i.e., by earning their money from selling drugs or by showing a recklessness in purchasing designer handbags from a guy in the parking lot of a strip club, for cash, for a fraction of their value[25]—Wilson intuited that he could likely target and steal from these victims without running the risk of the theft being reported to law enforcement.[26] Moreover, when Wilson ultimately stole from the

[24] The majority opinion describes Taylor as "a wealthy Atlanta businessman." But this characterization suggests that Taylor was a random victim in an isolated incident and does not accurately reflect that Taylor has also been involved in illicit activities, has a criminal record, has a history with Wilson, and has known Harris—the victim in this case and a known drug dealer—since childhood.

[25] Taylor testified that he met Wilson in the parking lot of the Onyx—a strip club where Wilson had also admittedly hung out with Harris—and purchased $40,000-worth of designer handbags for only $10,000 in cash. Taylor also testified that he did not exit his vehicle during this transaction and "wasn't sure" the situation was "safe." From these circumstances, the jury could infer that these handbags were stolen, and Taylor knew that. See *Daughtie v. State*, 297 Ga. 261, 262 (2) (773 SE2d 263) (2015) (concluding that such knowledge "may be inferred from the circumstances, when the circumstances would excite the suspicion in the minds of ordinarily prudent persons") (citation omitted).

[26] Taylor testified that, on May 31, 2011, he knew Wilson was the person who had robbed his condo, but he did not call the police because he preferred to "see [Wilson] himself," which meant to "beat" Wilson himself. According to Taylor, he did not decide to tell the police that Wilson was the perpetrator of the 2011 armed robbery until he saw that "they had [Wilson] on TV for

victims, he took items he could carry; items that would fit into bags; items that could easily be sold at a pawn shop or on the street; items like cameras, iPads, designer clothing and accessories, designer shoes, and watches. These are the kinds of items he stole from both victims, and the types of items Wilson looked for in selecting his mark.

In sum, the 2011 armed robbery demonstrated Wilson's modus operandi: a common plan or scheme to steal high-end, easily conveyable and transferrable items from wealthy, casual acquaintances or friends, who engaged in questionable (if not illegal) activity.[27] And, thus, the other-acts evidence was relevant to establishing that Wilson engaged in a common plan or scheme in committing the crimes in this case. See *Morrell*, 313 Ga. at 257 (2)

---

murder," but Taylor admitted that, if Wilson had not been "on the news," he "never would have told the police," which emphasizes that Wilson targeted people who were unlikely to report the crime to law enforcement.

[27] Although Harris's luxury car was also taken and later discovered burning with his body inside—which would distinguish the 2011 armed robbery from the present case—we do not know what circumstances gave rise to those distinguishing characteristics. But we do know that Taylor was not home when the 2011 armed robbery occurred, his housecleaner was held at gunpoint during the robbery, and Wilson threatened to kill the housecleaner if he went to the police.

(a). Additionally, the fact that "the other-acts evidence occur[ed] near in time" and place "helped establish the link necessary" to tie Wilson to the underlying crimes against Harris. Id.

3. Having concluded that the evidence was relevant, I also conclude that "the probative value of the evidence [wa]s not substantially outweighed by its undue prejudice" under Rule 403. *Prichett*, 314 Ga. at 774 (2) (a).[28] As noted above,

> [t]he Rule 403 analysis is committed to the trial court's discretion, and exclusion of relevant evidence under this test is an extraordinary remedy which should be used only sparingly. In reviewing issues under Rule 403, courts must look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact. There is no single test for conducting this Rule 403 balancing for "plan" evidence, likely because all circumstances should be taken into account.

*Morrell*, 313 Ga. at 259 (2) (b) (quoting *Jones v. State*, 301 Ga. 544,

---

[28] As to the last prong of this test—i.e., whether "there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act," id.—Wilson does not argue that "the State failed to satisfy its burden under the third part of the test to show that he committed" the 2011 armed robbery. *Greene v. State*, 316 Ga. 584, 597 (3) (889 SE2d 864) (2023). Additionally, at trial, the jury heard that Wilson was arrested and charged with several crimes arising from the 2011 armed robbery. Thus, I will not address this final prong.

546-547 (1) (802 SE2d 234) (2017) and *United States v. Brown,* 441 F3d 1330, 1362 (11th Cir. 2006); punctuation omitted). This Court has held that, when other-acts evidence is used to prove common plan or scheme, "temporal proximity and similarity between the offenses are factors that are frequently cited as heightening probative value." Id. at 260 (2) (b).

Mindful that "Rule 403 should be used to exclude evidence 'sparingly,'" *Morrell*, 313 Ga. at 260 (2) (b), I "see no abuse of discretion in the trial court's conclusion that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice." Id. There was no direct evidence in this case demonstrating that Wilson participated in the crimes against Harris, and Wilson disputed any involvement in the commission of these crimes, increasing the prosecutorial need for the other-acts evidence to explain Wilson's role as an active participant in the theft and murder of Harris. See *Jones*, 301 Ga. at 547 (1) (noting that the probative value of evidence becomes greater when the fact for which it is offered is disputed). The evidence of the 2011 armed robbery—

occurring a little over a year before the charged offenses and bearing striking similarities thereto—strengthened the link between Wilson and the crimes against Harris. Moreover, the trial court instructed the jury that it could consider the other-acts evidence only for certain limited purposes, including Wilson's common plan or scheme to commit the crimes for which he was charged and not for any other purpose, such as propensity to commit the crimes at issue. See *Greene v. State*, 316 Ga. 584, 602 (3) (889 SE2d 864) (2023).

For these reasons, I conclude that the trial court did not abuse its discretion in determining that the probative value of the other-acts evidence outweighed any prejudicial impact and in admitting the challenged evidence at trial. See *Nerey*, 877 F3d at 977 (VI).

4. Finally, given the recent trend in this Court's decisions regarding the admissibility of other-acts evidence under Rule 404 (b), I would caution prosecutors and trial courts in seeking to introduce such evidence, in allowing the admission of such evidence, and/or in instructing the jury on the limited purposes of such evidence to mindfully consider the circumstances in which we have

concluded this type of evidence will be admissible and to track our language and the parameters we have instituted in doing so.

Therefore, I respectfully dissent in part.